330 So.2d 914 (1976)
LAKE, INC.
v.
LOUISIANA POWER & LIGHT COMPANY.
No. 57085.
Supreme Court of Louisiana.
March 29, 1976.
Rehearing Denied May 14, 1976.
*915 Lamar M. Richardson, Jr., Ponder & Richardson, Metairie, for plaintiff-applicant.
Andrew P. Carter, Eugene G. Taggart, J. Wayne Anderson, Kenneth P. Carter, Monroe & Lemann, New Orleans, for defendant-respondent.
DIXON, Justice.
This case puts at issue the validity of the "St. Julien" doctrine, a judicially created method of acquisition of servitudes or rights-of-way by corporations possessing the power of expropriation.
Lake, Inc. purchased the lots involved (Lots 15 and 16, Square 14, Westwego Heights Subdivision, Parish of Jefferson) at tax sale in 1961, and obtained a judgment of confirmation in May of 1971. In 1972 Lake filed this action against Louisiana Power & Light Company, alleging that defendant possessed a "power line right-of-way" across the property, for which it has never been granted a servitude or title. The prayer was for recognition of plaintiff's ownership and right of possession, for an order requiring defendant to remove its property or deliver it to plaintiff, or in the alternative, to purchase a servitude for a price to be fixed.
A motion for summary judgment was filed supported by affidavits establishing that the power lines had been constructed across plaintiff's lots in 1930, when they were owned by Mrs. Lena Theriot; that Mrs. Theriot was aware of the lines, and from 1954 through 1958 had caused lawyers to write defendant, demanding compensation and damages, but that no further action had been taken by her.
The trial court granted summary judgment, dismissing plaintiff's petition. The Court of Appeal affirmed, Lake, Inc. v. Louisiana Power & Light Co., 318 So.2d 911 (La.App.4th Cir. 1975), and on plaintiff's application we granted writs.
St. Julien v. Morgan Louisiana & Texas Railroad Co., 35 La.Ann. 924 (1883), was one of the first of a long line of cases involving a theory of the creation of a servitude by "unopposed use and occupancy" by a corporation with the power of expropriation. (Jefferson and Lake Pontchartrain Railroad Co. v. The City of New Orleans, 31 La.Ann. 478 (1879), had relied on some of the same authorities for the doctrine of acquiescence). In the St. Julien case the landowner (in 1852) had given a right-of-way deed under private signature to a railway company which commenced construction by throwing up a roadbed across the land. The Civil War intervened, the landowner died and the railroad became insolvent. The landowner's son (the plaintiff) acquired the property of the insolvent. The plaintiff practically assisted the defendant in the completion of the construction, then became disenchanted with the railway running across his property, *916 and sued for compensation and, apparently, recognition of his ownership. A trial court judgment for plaintiff was reversed. This court, relying on common law authorities, held that public policy required "that in such case the owner shall not be permitted to reclaim his property free from the servitude he has permitted to be imposed upon it, but shall be restricted to his right of compensation." 35 La.Ann. 924, 926. (Nevertheless, plaintiff lost his subsequent suit for compensation. St. Julien v. Morgan's L. & T. R. & S. S. Co., 39 La.Ann. 1063 (1887)).
The St. Julien doctrine of acquiescence was thereafter regularly and frequently approved by the Louisiana Supreme Court until 1937, when it was strongly assailed in Gumbel v. New Orleans Terminal Co., 186 La. 882, 173 So. 518. Gumbel brought a petitory action against the railway because it had no title to nor conventional servitude across plaintiff's square of land in New Orleans. Defendant successfully claimed that it had acquired a servitude "by actually constructing tracks across the property and by maintaining and using the tracks for many years . . . with the consent and acquiescence of defendant (sic) and his authors in title." 173 So. 518, 519.
The court discussed the St. Julien doctrine:
"And the application of the doctrine is not dependent upon the lapse of any specific prescriptive period and even a brief period of occupancy and use of the property by a public utility, with the knowledge, consent, or acquiescence of the landowner, will suffice to effectuate the doctrine in favor of the utility.
"Thus, in Moore Planting Company v. Morgan's Louisiana & T. Railroad & S. S. Company, 126 La. 840, at page 872, 53 So. 22, 33, this court said:
"`These decisions [holding that a railroad which has gone into possession without title, but without opposition, and is in operation cannot be ousted by the owner, but has the right to continue in possession], be it noted, are not founded upon any law of prescription. The proof of this lies in the fact that the railroad is maintained in possession even though it has been in operation less than the shortest time required for prescription. Those decisions are founded upon the combined presumed consent of the owner of the land and the public interest. The owner of the land is presumed to have yielded, without an expropriation suit having been brought against him, what an expropriation suit would have compelled him to yield.'" 173 So. 518, 520.
The court dismissed Gumbel's argument that the St. Julien doctrine was contrary to the provisions of the Civil Code:
"The decisions in the St. Julien and subsequent related cases establish a method of creating a servitude not found in any article of the Civil Code covering servitudes. Since this method of creating a servitude (by unopposed use and occupancy) is extra-codal, plaintiff's argument based on the codal articles creating, regulating, and extinguishing servitudes is not appropriate." 173 So. 518, 523.
Gumbel lost, but he did not quit. The 1938 case, Gumbel v. New Orleans Terminal Co., 190 La. 904, 183 So. 212, describes Gumbel's effort to nullify the 1937 judgment for the reason that he had been un-constitutionally deprived of his property by "pure judicial legislation," contrary to C.C. 766, which said, "Immemorial possession itself is not sufficient to acquire" a discontinuous servitude, whether apparent or not. The court excused its action as an effort to reconcile provisions of the Civil Code with statutes granting railroads the power of expropriation; but even if it had been wrong, said the court, the plea of res judicata barred Gumbel's effort to nullify the judgment on an allegation of mere error. Gumbel also lost his third suit (for compensation) for the stated reason that the right to compensation is personal to the *917 owner of the land at the time the servitude is taken and is not acquired by a subsequent purchaser of the land in the absence of an assignment or subrogation. (Gumbel was also denied an alternative claim in the nature of rent).
In 1974 we granted writs to reconsider the "St. Julien" doctrine, but found it inapplicable because the landowner did not acquiesce in the encroachment by the utility company. Harrison v. Louisiana Power & Light Co., La., 288 So.2d 37.
Plaintiff strongly urges in brief that the application of the "St. Julien" doctrine violates constitutional prohibitions against taking property without due process (U.S. Const., Amendments 5 and 14) and against taking private property for public use without compensation (La.Const.1974, Art. 1, § 4; La.Const.1921, Art. 1, § 2; La. Const.1913, Art. 167; La.Const.1898, Art. 167; La.Const. 1899, Art. 156). The argument is persuasive, but we decline to rest our opinion on constitutional grounds when there are other reasons which lead to the same result. In re Interest of Toler, 262 La. 557, 263 So.2d 888 (1972); Tafaro's Investment Co. v. Division of Housing Improvement, 261 La. 183, 259 So.2d 57 (1972).
Normally, only an owner has the "right of imposing a servitude permanently on an estate." C.C. 729. "Servitudes are established by all acts by which property can be transferred, ..." C.C. 743. "Continuous and apparent servitudes may be acquired by title, or by a possession of ten years ... C.C. 765, or "by possession of thirty years." (C.C. 3504). Not so, however, for the acquisition of nonapparent or discontinuous servitudes. They can only be acquired by title.
"Continuous nonapparent servitudes, and discontinuous servitudes, whether apparent or not, can be established only by a title.
"Immemorial possession itself is not sufficient to acquire them.
"Immemorial possession is that of which no man living has seen the beginning, and the existence of which he has learned from his elders." C.C. 766.
An electric power transmission line is a discontinuous apparent servitude, because it "need(s) the act of man to be exercised." C.C. 727. In Nash v. Whitten, La., 326 So.2d 856, decided January 19, 1976, we held a natural gas pipeline to be discontinuous because the act of man was required for its exercise. The term "act of man" includes the operation of machinery necessary for the servitude's exercise. Nash v. Whitten, supra. See also 40 Tul. L.Rev. 397, 398 (1966).
The historical development of the civil law prohibition against the acquisition of discontinuous servitudes is found in Schoenrich, Acquisition Of Rights Of Way By Prescription, 12 Tul.L.Rev. 226 (1938). This prohibition, a new development in 1804 (Art. 691 of the Code Napoleon), is now recognized in most civil law jurisdictions, but with frequent dissenters who think a servitude requiring permanent constructions of steel, concrete and the like should be subject to acquisitive prescription. (See Ogborn v. Lower Terrebonne Refining & Mfg. Co., 129 La. 379, 56 So. 323 (1911)). Only Bolivia and Brazil of all Latin American countries permit the acquisition of discontinuous servitudes by prescription.
Ancient Roman law permitted the acquisition of discontinuous servitudes by prescription, as did Las Sietc Partidas and the common law. Three reasons are advanced for the adoption of the prohibition in Code Napoleon 691: (1) to establish greater certainty with respect to rights in real property; (2) in reaction to the chaotic condition of the law of servitudes in France and the large number of nonapparent and discontinuous servitudes, which had been claimed during the centuries; (3) the influential custom of Paris had rejected prescription as a means of acquiring these servitudes. (12 Tul.L.Rev. 226, 230).
*918 Some of the same reasons exist for continuing to honor the positive pronouncement of the Civil Code prohibiting the acquisition of discontinuous servitudes except by title. The public records doctrine in Louisiana would suffer if the dismemberment of title is unnecessarily permitted without recordation. The cumulative experience of the civil law is that only servitudes which are both continuous and apparent should be susceptible of acquisition by prescription.
Consequently, St. Julien v. Morgan Louisiana & Texas Railroad Co., 35 La. Ann. 924 (1883); Gumbel v. New Orleans Terminal Co., 186 La. 882, 173 So. 518 (1937); Gumbel v. New Orleans Terminal Co., 190 La. 904, 183 So. 212 (1938); Gumbel v. New Orleans Terminal Co., 197 La. 439, 1 So.2d 686 (1941) and those cases depending on the "St. Julien" doctrine are overruled, insofar as they conflict with the views here expressed.
The return to the Civil Code provisions governing the establishment of servitudes, and the abandonment of the deviant and conflicting jurisprudence, is important to the clarity and predictability of the law. Only clearly established public necessity should influence the court to perpetuate the St. Julien doctrine. Its existence at one time might have been excused by the fear that important public services might have been interrupted if a landowner were sustained in his contention that a discontinuous servitude could only be established by title. Not so today.
However, the St. Julien doctrine has become a rule of property, probably relied on by utilities since its establishment. Because the doctrine has been so entrenched and repeatedly affirmed by this court, the ruling in this case, as to property not involved in this suit, will be prospective only, affecting conduct occurring after the finality of this judgment.
For these reasons, the judgments of the courts below are reversed, the motion for summary judgment is denied, and the case is remanded to the district court for further proceedings.
TATE, J., dissents in part and assigns written reasons.
TATE, Justice (concurring in part, dissenting in part).
The writer concurs insofar as we overrule the St. Julien doctrine as not authorized by our civil code.
The writer dissents, however, insofar as we find that Louisiana Power did not acquire a right of way by acquisitive prescription. In the writer's opinion, the powerline right of way is a continuous apparent servitude which was acquired by prescriptive possession of ten years. Civil Code Art. 765.
For the reasons set forth in my dissent, Nash v. Whitten, La., 326 So.2d 856, 862, I am unable to agree that this apparent servitude is "discontinuous" simply because of an act of man away from the servitude premises is required for its exercise.
The apparent servitude was of a nature that any person who acquired the servient estate was fully on notice of its permanent nature involving the continuous subjection of the servient estate to its use. The servitude did not require its owner to exercise it by an act of man on the servient estate.
The majority permits semantical reasons to outweigh the functional purpose of Civil Code Article 727, when it holds that this apparent powerline servitude, obviously of a permanent and continuous nature, is nevertheless not subject to acquisition by prescription.
The civil code article defines a continuous servitude as one whose use "is or may be continual without the act of man."
The code article cites "aqueduct, drain, view" as examples of continuous servitudes. To the writer, they are of a nature more similar to the present than the article's *919 examples of discontinuous servitudes: "rights of passage, of drawing water, pasture."
The latter concern a transient type of human usage which depends on an act of the dominant owner on the servient estate to exercise the servitude, an act done at different times of the day, season, or year. The latter represent a discontinuous relationship, which may be contrasted with the continual and permanent relationship between the two estates represented by the type of servitude here at issue.
I therefore respectfully dissent.