835 So.2d 543 (2002)
CONCHA CHEMICAL PIPELINE
v.
E.B. SCHWING, III.
No. 2001 CA 2093.
Court of Appeal of Louisiana, First Circuit.
September 27, 2002.
Amy D. Berret, James P. Dore', Baton Rouge, for Plaintiff-Appellee Concha Chemical Pipeline.
Stan P. Baudin, Patrick W. Pendley, Plaquemine, for Defendant-Appellant Edward B. Schwing, III.
Before: FITZSIMMONS, GUIDRY, and PETTIGREW, JJ.
PETTIGREW, J.
Prior to the institution of this expropriation proceeding, plaintiff pipeline company erroneously believed that it had acquired consent from all of the affected landowners. After construction of its pipeline was nearly complete, the pipeline company learned that it had not secured consent from one landowner. When negotiations to acquire the outstanding interest failed, the pipeline company filed suit for expropriation. From a judgment awarding compensation to the landowner, the landowner has appealed seeking trespass damages. We affirm.

FACTS
Concha Chemical Pipeline Company ("Concha"), plaintiff herein, constructs, operates, and maintains (by contract with Shell Pipeline Corporation ("Shell")) "common carrier petroleum pipelines" for the transmission and transportation of petroleum, its products, and by-products.
During June, July, and August of 1996, Concha Chemical Pipeline Company ("Concha"), plaintiff herein, contacted numerous landowners and secured right-of-way agreements for development of the Lou-Tex pipeline, a 265-mile pipeline stretching from Sorrento, St. James Parish, Louisiana to Mont Belvieu, Texas. In connection therewith, Concha executed Pipeline Right-of-Way agreements with various members of the Schwing family. *544 Said right-of-way agreements granted to Concha a servitude and right-of-way for the construction of a common carrier pipeline across undivided property owned by the individual Schwing heirs and situated in Sections 27 and 28, Township 10 South, Range 11 East, in Iberville Parish, Louisiana.
One of these landowners, Edward B. Schwing, III ("Mr.Schwing"), defendant herein, signed the right-of-way agreement in his capacity as agent and attorney-in-fact for the interests he had previously transferred to his three children. This agreement was ultimately recorded in the conveyance records of Iberville Parish. Mr. Schwing did not mention that he personally retained an interest in the property.
In October of 1996, after the pipeline was constructed and operational, Mr. Schwing contacted a representative of Shell and advised that he owned an undivided 1.319 percent interest in property affected by the pipeline. Mr. Schwing also advised that while he had executed the Pipeline Right-of-Way Agreement on behalf of his children, he had not executed the agreement on his own behalf. Mr. Schwing claimed he was entitled to compensation for Concha's use of his land.
Thereafter Concha attempted to negotiate with Mr. Schwing for the acquisition of this conventional right-of-way and servitude. When the parties were unable to agree upon the terms and compensation to be paid to Mr. Schwing, Concha filed a Petition for Expropriation on April 18, 1997.

ACTION OF THE DISTRICT COURT
In response, Mr. Schwing filed an answer and reconventional demand on May 19, 1997. Mr. Schwing asserted that Concha was a bad faith possessor and that Concha's construction of the pipeline constituted a trespass that disturbed his peaceful possession of the property. Mr. Schwing sought immediate removal of the pipeline, or in the alternative, for injunctive relief during the pendency of this litigation and nonpecuniary damages. Concha filed a motion for summary judgment on March 13, 1998, and asserted that Mr. Schwing had acquiesced to the taking of his property and the construction of the pipeline by Concha. Accordingly, Concha asserted that Mr. Schwing was estopped from complaining about the pipeline's construction.
Following a hearing on June 2, 1998, the district court granted Concha's Motion for Summary Judgment on January 14, 1999. The district court also held that Concha had the right to expropriate Mr. Schwing's property, and further ruled that the only remaining issue was the just compensation due Mr. Schwing.
On October 24, 2000, the district court issued a judgment together with a supporting legal opinion. The court awarded Mr. Schwing a total of $8,106.62, which sum represented the value of his property used for the servitude.
Concha filed a Motion for New Trial on October 30, 2000, requesting that the award of $8,106.62 to Mr. Schwing be vacated. The Motion for New Trial was granted and by judgment dated March 7, 2001, the district court amended its earlier judgment and awarded Mr. Schwing the sum of $1,846.80, for his 1.319 percent interest in the Schwing family's 368.74 rods of the pipeline.
From this judgment, Mr. Schwing has appealed.

ISSUE ON APPEAL
The sole issue put forth by Mr. Schwing in this appeal is:

*545 1. Whether the trial court's failure to award damages for trespass was incorrect and whether an award of trespass damages is appropriate.

DISCUSSION
The Louisiana Constitution of 1974 provides that the appellate jurisdiction of the courts of appeal extends to both law and facts. La. Const., art. V, § 10(B). A court of appeal may not overturn a judgment of a trial court absent an error of law or a factual finding that is manifestly erroneous or clearly wrong. See Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882, n. 2 (La.1993). In an expropriation proceeding, the factfinder's factual determinations as to value of property and entitlement to any other types of damages will not be disturbed upon review in the absence of manifest error. State, Department of Transportation and Development v. Estate of Davis, 572 So.2d 39, 45 (La. 1990). The trial court is granted a great deal of discretion in determining the value of property in expropriation cases. See State, Department of Transportation and Development v. Mayet, 521 So.2d 671, 673 (La.App. 1 Cir.1988).
Expropriation of private property for public purposes is addressed in Article 1, Section 4 of the Louisiana Constitution of 1974, which provides in pertinent part, as follows:
Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit. Property shall not be taken or damaged by any private entity authorized by law to expropriate, except for a public and necessary purpose and with just compensation paid to the owner; in such proceedings, whether the purpose is public and necessary shall be a judicial question. In every expropriation, a party has the right to trial by jury to determine compensation, and the owner shall be compensated to the full extent of his loss.
In addition, Louisiana Revised Statute 45:254 provides:
Expropriation; telegraph and telephone lines; utilizing streams, highways, etc.
All persons included in the definition of common carrier pipe lines as set forth in R.S. 45:251[1] have the right of expropriation with authority to expropriate private property under the state expropriation laws for use in its common carrier pipe line business, and have the right to lay, maintain and operate pipe lines, together with telegraph and telephone lines necessary and incident to the operation of these pipe lines, over private property thus expropriated, and have the further right to lay, maintain and operate pipe lines along, across, over and under any navigable stream or public highway, street, bridge or other public place, and also have the authority, under the right of expropriation herein conferred, to cross railroads, street railways, and other common carrier pipe lines by expropriating property necessary for the crossing under the expropriation laws of this state. The right to run along, across, over or under any *546 public road, bridge or highway, as before provided for, may be exercised only upon condition that the traffic thereon is not interfered with, and that such road or highway is promptly restored to its former condition of usefulness, at the expense of the pipe line owner, the restoration to be subject also to the supervision and approval of the proper local authorities, and, provided, that in the exercise of the privilege herein conferred, owners or operators of these pipe lines shall compensate the parish, municipality or road district, respectively, for any damage done to such public road, in the laying of pipe lines, telegraph or telephone lines, along, under, over or across the same. Nothing in this Section shall be construed to grant any pipe line company the right to use any public street or alley of any incorporated city, town or village, except by express permission from the city or other governing authority.
The parties hereto evidently do not dispute Mr. Schwing's right to recover just compensation for Concha's expropriation of his land. In this appeal, Mr. Schwing does not take issue with the $1,846.80 that the district court awarded to him as just and adequate compensation for his expropriated property. Accordingly, all issues related to the compensation owed to Mr. Schwing in connection with the expropriation of his property have apparently been waived.
The sole issue raised by Mr. Schwing in connection with his appeal in this matter is whether the district court's failure to award trespass damages was correct, and whether said damages were appropriate under the facts of this case. Mr. Schwing argues that pursuant to La. Const. Art. 1, § 4, Concha was required, prior to any formal expropriation proceedings, to show a public and necessary purpose before it began construction of the pipeline. Mr. Schwing contends that Concha was further required to obtain a judicial determination that the purpose of the pipeline met the requirements of a "necessity" before it began construction of the pipeline across his property. Mr. Schwing complains that even after Concha learned of his outstanding ownership interest, it failed to halt construction of the pipeline. For these reasons, and because he did not give Concha consent to construct its pipeline across his land, Mr. Schwing claims that he is entitled to trespass damages from Concha for its actions as a "bad faith trespasser."
In response, Concha asserts that although it used Mr. Schwing's land, it never intended to possess the land as its owner. As such, Concha argues it should not be deemed a possessor of the land. Concha further argues that it is not a trespasser, as said term requires an unauthorized entry onto private property.[2]
Concha asserts that it went on Mr. Schwing's land under the belief that it had authorization from all landowners. Once Concha learned of Mr. Schwing's uncompensated interest in the property, it began to negotiate with him in an attempt to secure his consent. Concha further asserts that while the negotiations were taking place, Mr. Schwing never complained about the ongoing pipeline construction and purportedly expressed and implied that construction could proceed. Accordingly, Concha argues that where a landowner silently acquiesces to the placement of items on his property or in the appropriation of his property, the landowner is not *547 entitled to demand demolition or removal of the items, nor is he entitled to trespass damages.
In support of this position, Concha urges this court to apply the St. Julien Doctrine. This court, in Cancienne v. Lafourche Parish Police Jury, 423 So.2d 662, 665 (La. App. 1 Cir.1982), traced the historical development of the St. Julien Doctrine that culminated in the enactment of La. R.S. 19:14. In Cancienne, this court stated:
The St. Julien Doctrine was established in 1879 in the case of St. Julien v. Morgan L. & T.R. Co., 35 La.Ann. 924 (1883). In St. Julien, the defendant railroad company entered onto plaintiff's land without permission and constructed a railway upon the land without purchasing or expropriating the property. The court there said:
"... the landowner did not invoke the arm of the law at the time when it could have been of service to him, but on the contrary acquiesced in the defendant's taking possession and using his property, encouraged it to prosecute its work by abstaining from any attempt to prevent it and made no complaint in a court of law of the injuries inflicted upon him until the defendant had expended large sums of money in completing its line. Having thus permitted the use and occupancy of his land and the construction of a quasi public work thereof without resistance or even complaint, he cannot afterwards require its demolition, nor prevent its use, nor treat the Company erecting it as his tenant. He is not debarred from an action for damages by reason of the taking of the land and for its value, but having acquiesced in the entry and encouraged it he did not invite it, he cannot afterwards affect to treat it as tortious. Considerations of public policy, not less than the suggestions of natural justice, require that in such case the owner shall not be permitted to reclaim his property free from the servitude he has permitted to be imposed upon it, but shall be restricted to his right of compensation. Goodin v. Cincinnati, 18 Ohio St., 169."
Therefore, by jurisprudential rule, a new theory was created allowing the creation of servitudes by estoppel. From 1879 until 1976, a public or quasi public corporation with powers of expropriation could acquire a servitude over the land of another without expropriation if the landowner consented or acquiesced in the construction. The landowner could not later reject the occupant, but was relegated to an action for compensation and damages. The theoretical justification of St. Julien was the combined presumed consent of the owner of the land and the public interest. To avoid the needless waste and public inconvenience involved in removing expensive works, the court established the fiction that the owner had granted voluntarily what an expropriation suit otherwise would have compelled him to yield.

St. Julien was re-affirmed in many later cases and remained the rule of law until 1976 when Lake, Inc. v. Louisiana Power & Light Company, 330 So.2d 914 (La.1976) was decided.
The Lake case abolished the St. Julien Doctrine with respect to discontinuous apparent servitudes, but held its decision applied prospectively only. The majority opinion in Lake classified an electrical transmission line as a discontinuous apparent servitude because it required an act of man for its exercise and as such found that under La.C.C. art. 766 it could only be acquired by title. Lake overruled St. Julien and its progeny *548 as to prospective conduct because St. Julien sanctioned a method of creating servitudes contrary to the mandates of the Civil Code. In addition, Lake rejected the policy rationale of St. Julien, finding that although it may have once been justified by public necessity, now it was no longer needed.
Additionally in Lake, Chief Justice Dixon, author of the opinion, stated as follows:
"Plaintiff strongly urges in brief that the application of the `St. Julien' doctrine violates constitutional prohibitions against taking property without due process (U.S. Const., Amendments 5 and 15) and against taking private property for public use without compensation (La. Const.1974, Art. 1, § 4; La. Const.1921, Art. 1, § 2, La. Const.1913; Art. 167; La. Const. 1898, Art. 167; La. Const. 1899, Art. 156). The argument is persuasive, but we decline to rest our opinion on constitutional grounds when there are other reasons which lead to the same result. In re Interest of Toler, 262 La. 557, 263 So.2d 888 (1972); Tafaro's Investment Co. v. Division of Housing Improvement, 261 La. 183, 259 So.2d 57 (1972)."
Shortly after the decision in Lake, the Louisiana Legislature adopted La.R.S. 19:14 which provides as follows:
"In any case where the state or its political corporation or subdivision has actually, in good faith believing it had authority to do so, taken possession of privately owned immovable property of another, and constructed facilities upon, under or over such property with the consent or acquiescence of the owner of the property, such owner shall be deemed to have waived his right to contest the necessity for the taking and to receive just compensation prior to the taking, but he shall be entitled to bring an action for such compensation, to be determined in accordance with the provisions of Section 9 of this Title, for the taking of his property or interest therein, the just compensation to be determined as of the time of the taking of the property, or right or interest therein, and such action shall proceed as if the state, its political corporation or subdivision had filed a petition for expropriation as provided for in Section 2.1 of this Title.

In the case where any corporation referred to in Section 2 of this Title has actually, in good faith believing it had the authority to do so, taken possession of privately owned immovable property of another and constructed facilities upon, under or over such property with the consent or acquiescence of the owner of the property, it will be presumed that the owner of the property has waived his right to receive just compensation prior to the taking, and he shall be entitled only to bring an action for judicial determination of whether the taking was for a public and necessary purpose and for just compensation to be determined in accordance with Section 9 hereof, as of the time of the taking of the property, or right or interest therein, and such action shall proceed as nearly as may be as if the corporation had filed a petition for expropriation as provided in Section 2.1 of this Title."

Essentially the above act provides that a landowner who consents or acquiesces to construction on his property by an entity with expropriation powers, thereby waives the right to prior compensation. The owner may thereafter bring an action for just compensation with the amount of recovery fixed as of *549 the time of the taking. Additionally, if the occupation is by a private entity with expropriation powers, the landowner may subsequently challenge the necessity and public purpose of the taking. When the State or its subdivisions are the takers, the act precludes any further challenge of public purpose. For either the State, its subdivisions or a quasi public corporation to enjoy the benefits of the act, it must have proceeded "in good faith believing it had the authority."
Therefore, the St. Julien Doctrine, created and perpetuated jurisprudentially until the Lake decision in 1976, now has been essentially reinstated legislatively through La.R.S. 19:14 to the status of positive law.
Cancienne, 423 So.2d at 665-667 (footnotes omitted) (underscoring supplied).
We note from the record that the district court, in its grant of Concha's Motion for Summary Judgment on January 14, 1999, gave extensive written reasons in support of its holding that Concha had the right to expropriate Mr. Schwing's property. The district court found:
Concha did contact a company entitled Schwing, Inc., through its president, Mr. Charles Schwing. In turn, as he had done in the past, Charles Schwing contacted Defendant, Ed Schwing, to secure his approval for the Concha pipeline. At that time, Mr. Charles Schwing was under the mistaken belief that any interest Ed Schwing had in the subject property had been transferred to Ed Schwing's children. Under that mistaken belief, Charles Schwing presented to Ed Schwing the pipeline right-of-way (ROW) agreement, which Ed Schwing signed on behalf of his children. This took place in July of 1996. At that time, Ed Schwing said nothing about his interest in the property to Mr. Charles Schwing or any Concha representative. The agreement described the specific property to be expropriated, along with the names of the presumed owners.
It appears from the affidavits and supporting documents that Ed Schwing had, some years ago, told Schwing, Inc., the land manager for Defendant, Ed Schwing, and all of the Schwing landowners, that he was transferring his interest in all Schwing lands to his children, except for a couple of parcels. Pursuant to that request, Schwing, Inc. began sending all of the income from the Schwing lands formerly in Ed Schwing's name to his children, except for the one or two parcels Schwing Inc. understood Ed Schwing retained. The income from the property subject to this suit went to Ed Schwing's children, according to the affidavit of Charles Schwing, the Schwing, Inc. president. At no time did Ed Schwing protest or even comment on this procedure.
When presented with the Concha pipeline ROW agreement by Charles Schwing, on behalf of Schwing, Inc., in July 1996, Ed Schwing signed without comment. He claims he did not read the agreement and that is why he did not comment. Later, in September of 1996, he went out to the subject property and saw the pipeline. At that time, he began a series of negotiations with Concha directly for his interest. At the time Ed Schwing discovered the pipeline on the property, it was in the ground and ready to be backfilled. Ed Schwing never demanded Concha stop its construction or cease use of the pipeline, until just before the filing of its reconventional demand in April, 1997.
. . . .
This Court is of the opinion that at the time Ed Schwing was presented the right-of-way agreement to sign for his *550 children, he became aware of the pipeline across the property in which he held a small interest. Even if this were not the case, in September of 1996, when he claims to have discovered the pipeline on property in which he still held an interest, he did nothing to prevent its completion or use.
. . . .
Based upon the facts established by the depositions of E[d] Schwing, Keith Nelson, Don Davis, months of negotiations were carried out with Ed Schwing to acquire his interest in the pipeline right-of-way. Mr. [Ed] Schwing admitted that, in his mind, he had Concha "over a barrel" and was going to make the most out of it....
This Court is convinced that Concha acted in good faith. Relying on Schwing, Inc.'s president, Charles Schwing, for land ownership of large tracts, was common practice in pipeline ROW acquisition as stated by Don Davis and Keith Nelson, long time ROW agents, and Charles and Ed Schwing, who had both done so for Schwing, Inc. for several decades.
. . . .
There is little doubt in this Court's mind that the St. Julien doctrine applies in this case. The affidavits on record clearly show Ed Schwing was aware, or should have been aware, that the pipeline crossed his property. He certainly acquiesced for several months in the construction and use of the pipeline before any complaint was lodged. Consequently, [Ed Schwing] may only claim the just compensation due as a result of the taking. [Underscoring contained in original judgment.]
Based upon a thorough review of the record and an examination of the applicable law, we cannot say that the district court erred in failing to award trespass damages to Mr. Schwing.

CONCLUSION
For the above and foregoing reasons, the judgment of the district court is hereby affirmed. All costs associated with this appeal shall be assessed against defendant, Edward B. Schwing, III.
AFFIRMED.
NOTES
[1] Louisiana Revised Statutes 45:251(1) states that the term "common carrier" as used in this Section, "includes all persons engaged in the transportation of petroleum as public utilities and common carriers for hire; or which on proper showing may be legally held a common carrier from the nature of the business conducted, or from the manner in which such business is carried on." Mr. Schwing evidently does not contest Concha's status as a common carrier.
[2] Concha relies upon Black's Law Dictionary (6th Ed.1990) that defines "trespass" as "[a]n unauthorized interference with one's person, property, or rights.... Any unauthorized intrusion or invasion of private premises or land of another."