# STATE OF LOUISIANA

# COURT OF APPEAL, THIRD CIRCUIT

## 05-119

**STEVE H. CROOKS AND ERA LEE CROOKS**

**VERSUS**

**PLACID REFINING COMPANY**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
TWENTY-EIGHTH JUDICIAL DISTRICT COURT
PARISH OF LASALLE, DOCKET NO. 30,655
HONORABLE ALFRED A. MANSOUR, JUDGE AD HOC

\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**SYLVIA R. COOKS**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, and J. David Painter, Judges.

**AFFIRMED.**

Robert G. Nida
2001 MacArthur Drive
P.O. Box 6118
Alexandria, Louisiana 71307-6118
(318) 445-6471
COUNSEL FOR PLAINTIFFS/APPELLANT:
 Steve H. Crooks and Era Lea Crooks

Donald R. Wilson
Gaharan & Wilson
P.O. Box 1346
Jena, Louisiana 71342
(318) 992-2104
COUNSEL FOR DEFENDANT/APPELLEE:
 Placid Refining Company

**COOKS, Judge.**

## STATEMENT OF THE CASE

Plaintiffs, Steve and Era Lea Crooks, appeal the decision of the trial court granting a partial summary judgment in favor of Placid Refining Company (Placid), dismissing claims relating to damages for trespass, loss of use, rental value, timber trespass, and attorney's fees. The basis of the claim is Placid's use of a four-inch pipeline traversing the Crooks property which has been in continuous operation collecting and transporting oil since 1951. The trial court held the claim was governed by the St. Julien Doctrine, codified in La.R.S. 19:14, and held plaintiffs were limited to an action for compensation based upon the value of the right of way taken as of the date of taking. For the reasons assigned below, we affirm the decision of the trial court.

## STATEMENT OF THE FACTS

In 1939, W.H. Mills owned the 120 acre tract of land, located in Section 13, Township 10 North, Range 2 East, LaSalle Parish, which is the subject of this dispute. On June 26, 1939, Mr. Mills granted an oil, gas, and mineral lease on the property in favor of Thomas J. Moore. On July 20, 1939, Mr. Mills granted another oil, gas, and mineral lease on the property in favor of R.E. Anderson. Both leases were ultimately assigned to Arkansas Fuel Oil Company and contained the standard clause allowing the lessee, and its heirs or successors, the privilege of "laying pipelines, building tanks, power stations, telephone lines and other structures" on the leased property in furtherance of drilling operations.

In September 1939, Mr. Mills died, and Mildred Mills McCutchan, a resident of California, acquired the property. On July 30, 1940, Arkansas Fuel Oil Company obtained a permit from the Department of Conservation to begin drilling operations

2

on the tract of land. Later that same year, the Arkansas Fuel Oil Company Mills #1 Well began production. This well produced oil revenues from 1940 until 1954.

On October 18, 1951, Placid Oil Company (predecessor to Placid Refining Company), gave notice it was purchasing oil, gas, and other minerals from Mills #1 Well, owned by Arkansas Fuel Oil Company. This document was recorded in the public records. Pursuant to their agreement with Arkansas Fuel Oil Company, Placid laid a four-inch pipeline on the property for the purpose of collecting and transporting oil from the Mills #1 Well to a central collection point.[1] From 1951 to 1954, Placid used the pipeline to transport oil from the well located on the leased property. On June 3, 1954, Arkansas Fuel Oil Company obtained a permit to plug and abandon Mills #1. After the well was abandoned, Placid continued to use the pipeline to collect and transport crude oil from other nearby wells to the same collection point, even though those wells were not located on the McCutchen property. This practice continued for forty-seven years until 1998 when Placid removed the pipeline.[2] From 1951 to 1998, Placid expanded its business and began operating an extensive crude oil gathering system in LaSalle Parish. Prior to its removal by Placid in 1998, the pipeline was part of a system linking over four hundred miles of pipelines used to collect, transport and deliver crude oil, produced from over three hundred wells and operated by fifty different operators, to a central facility in Searcy, Louisiana. From there the oil is transported by a large pipeline to Boyce, Louisiana and is ultimately destined for various refineries throughout the southern United States. Placid estimates it delivers up to 12,000 barrels of crude oil per day from the Searcy facility

---

[1] Plaintiffs contend there is no evidence Placid was the company that physically laid the four-inch pipe. However, there is no dispute that Placid began using the pipeline in 1951 to transport oil.

[2] The record also indicates, during this period, on September 26, 1972, Mildred Mills McCutchan granted an oil, gas and mineral lease in favor of Placid Oil Company to explore for minerals on the property.

3

to the facility in Boyce, Louisiana. It is undisputed from 1951 until 1998, Placid paid nothing for the use of the pipeline traversing the Mills property.

In February 1998, Steve Crooks, Clerk of Court for LaSalle Parish, became interested in purchasing the property. Upon inspection, prior to purchase, Mr. Crooks discovered the existence of the pipeline, the unauthorized use, and the fact that the line had ruptured, spilling oil onto the surface. On March 1, 1998, Mr. Crooks and his wife, Era Lea, purchased the acreage, along with any cause of action relating to the property. In the Act of Sale, the Crooks specifically acquired "any and all claims, rights, and causes of action of any kind or nature whether personal or real in and to the surface of the property being conveyed which may have accrued up to the date of filing of this deed." Within one year of purchasing the property, the Crooks instituted suit against Placid seeking compensation for the use of the pipeline, the value of timber remove through bush hogging of the right of way, trespass damages, surface damages, and attorney's fees. The Crooks amended their petition seeking additional damages, including fair rental value for the pipeline based upon $1.3909 per barrel for each barrel of oil transported through the pipeline from 1951 until 1998. Shortly after suit was filed, Placid removed the four-inch pipeline from the Crooks property. On February 8, 2000, the Crooks sold the property specifically reserving their cause of action against Placid.

## LAW AND DISCUSSION

*St. Julien Doctrine and La.R.S. 19:14*

Placid does not dispute liability. The issue presented in this appeal is the measure of damages due the landowner. The trial court limited the Crooks to the value of the right of way taken as of the date of the taking. The trial court relied on the St. Julien Doctrine, which is now codified in La.R.S. 19:14. This jurisprudential

4

rule had its inception in the case of *St. Julien v. Morgan Louisiana & Texas Railroad Company*, 35 La.Ann. 924 (1883). In *St. Julien*, the plaintiff's father, by act under private signature, dated 1852, granted a right of way over his property to the New Orleans, Opelousas & Great Western Railroad Company for the construction of a railroad. In 1858 or 1859, the railroad company constructed a road bed, but no rails or ties were laid. Work on the railway was interrupted by the Civil War and the New Orleans, Opelousas & Great Western Railroad Company became insolvent. In 1870, Charles Morgan bought the company at sheriff's sale. The deed was recorded in Lafayette Parish where the property is located. Mr. Morgan sold to another railway company which began preliminary work on the property. In 1879, Mr. Morgan reacquired the railroad company, laid rails and cross ties on the property and began operations. The landowner objected and sued to take back possession of his property and for recovery of rent from the railroad company. The supreme court found the landowner consented and/or acquiesced in the construction, quoting from the landowner's testimony at trial, as follows:

> When they were laying the rails and cross ties upon the road bed I made no objection. I did not then know the inconvenience of having a railroad through my place. I was at that time a railroad man, in favor of railroads. I did not at that time intend to charge for the right of way, until I found out that they did not put up the cattle guards properly and allowed my stock to get out. I am not positive, I believe I talked to a lawyer about an injunction to be protected in my property.

*Id.* at 924.

Once a landowner consented or acquiesced in the construction, the supreme court found "[c]onsiderations of public policy" prevented him from thereafter reclaiming his property free of the servitude. The court stated:

> Certain it is he did not at that time invoke the arm of the law at the time when it could have been of service to him, but on the contrary acquiesced in the defendant's taking possession and using his property, encouraged it to prosecute its work by abstaining from any attempt to

5

prevent it, and made no complaint in a court of law of the injuries inflicted upon him until the defendant had expended large sums of money in completing its line. Having thus permitted the use and occupancy of his land and the construction of a *quasi* public work thereon without resistance or even complaint, he cannot afterwards require its demolition, nor prevent its use, nor treat the Company erecting it as his tenant. He is not debarred from an action for damages by reason of the taking of the land and for its value, but having acquiesced in the entry and encouraged if he did not invite it, he cannot afterwards affect to treat it as tortious. Considerations of public policy, not less than the suggestions of natural justice, require that in such case the owner shall not be permitted to reclaim his property free from the servitude he has permitted to be imposed upon it, but shall be restricted to his right of compensation.

*Id.*

Consent or acquiesce by the landowner was an indispensable element in permitting the establishment of a servitude on private property by a company. Absent consent or acquiescence, proof of public benefit would not be enough to defeat an action for trespass. Quoting from Mills on Eminent Domain, §140, the court stated:

> The owner may by his consent waive his right to prepayment of damages. The courts should not be ingenious in drawing inferences of a waiver, where corporations are to be benefitted, which would be scouted where natural persons are concerned. The fact that the public would be discommoded by the owner's persistence, adds nothing to the presumption of the waiver. *The public have no interest in a completed public improvement, which should cause the rights of the landowner to be disregarded.* Slight acts of acquiescence on the part of the owner will estop him from interfering with the running of a railroad. He will not be deprived of his claim for damages, or his right to enforce it in all proper modes, but if he has, in any sense, for the shortest period, clearly given the corporation, either by his express consent or by his silence, to understand that he did not intend to object to their proceeding with the construction and operation, he cannot, on non-payment of compensation, maintain ejectment. If there was a waiver in fact, either express or implied, by acquiescing in the proceedings of the Company, to the extent of not insisting upon prepayment as a condition precedent, but consenting to let the damages lie and remain a mere debt, with or without a lien upon the road bed, then it is impossible to regard the corporation, in any sense, in the light of trespassers, or liable in ejectment.

*Id*. (emphasis added.)

*St. Julien* established "by jurisprudential rule, a new theory. . . allowing the

creation of servitudes by estoppel." *Concha Chem. Pipeline v. Schwing,* 01-2093 (La.App. 1 Cir. 9/27/02), 835 So.2d 543, 547. The practical application of the St. Julien Doctrine was articulated in *Concha Chemical Pipeline,* wherein the appellate court stated:

> From 1879 until 1976, a public or quasi public corporation with powers of expropriation could acquire a servitude over the land of another without expropriation if the landowner consented or acquiesced in the construction. The landowner could not later reject the occupant, but was relegated to an action for compensation and damages. The theoretical justification of *St. Julien* was the combined presumed consent of the owner of the land and the public interest. To avoid the needless waste and public inconvenience involved in removing expensive works, the court established the fiction that the owner had granted voluntarily what an expropriation suit otherwise would have compelled him to yield.

*Id.* At 547.

In *Veillon v. Columbia Gulf Transmission Co.,* 192 So.2d 646 (La.App. 3 Cir. 1966), *writ denied*, 195 So.2d 143 (La. 1967), this court, Judge Tate writing, applied the St. Julien Doctrine and held trespass damages were not recoverable for unauthorized construction of a pipeline and the landowner was only entitled to an award for the value of the servitude created plus severance damages. In *Veillon*, Columbia Gulf Transmission Company constructed a gas pipeline across Veillon's property without his consent. Veillon refused the company's initial offer of compensation, but when the company proceeded with construction, Veillon was present on the site and did not object to the installation of the pipeline. Veillon argued he was under the mistaken belief that Columbia had the right to lay the pipeline based on a 1953 deed. This court held:

> Nevertheless, the St. Julien doctrine applies even though the landowner's lack of opposition is due to an error of law, see original St. Julien decision, 35 La.Ann. 924 (where the landowner stood by in 1879 uncertain as to whether an 1852 right of way deed conferred any rights upon the railroad company), or to an error of fact, see Maxfield v. Gulf States Utilities Co., La.App. 1 Cir., 65 So.2d 615 (the landowner did not

7

protest construction of a utility line, for which they had refused to grant a servitude, until some years later when afer a formal survey they learned of the utility's encroachment.

*Id.* at 649.

In finding the landowner acquiesced in the taking, Judge Tate articulated the St. Julien Doctrine:

> [A] landowner waives his right to attack as legally unauthorized the use of his land appropriated for a public purpose by a party with power of eminent domain, when the landowner with full knowledge of the unauthorized taking expressly consents to it or silently acquiesces therein.
> By reason of this "St. Julien doctrine" (so called after the parent case), the landowner cannot reclaim his property but is instead relegated to a claim for compensation for the value of the property taken and for the severance damages sustained by the remainder of his tract, both determined as of the date of the taking.

*Id.* at 648 (citations omitted).

Interestingly, the appellate court did not explore the issue of whether Columbia Gulf Transmission Company had the power of expropriation or whether the taking was for a public purpose.

*St. Julien* remained the law until 1976 when it was overruled in *Lake, Inc. v. Louisiana Power & Light Company*, 330 So.2d 914 (La. 1976). The *Lake* case placed "at issue the validity of the 'St. Julien' doctrine, a judicially created method of acquisition of servitudes or rights-of-way by corporations possessing the power of expropriation." *Id.* at 914.

Lake, Inc. acquired Lots 15 and 16 in Westwego Heights Subdivision. Lake then sued Louisiana Power & Light Company alleging the company possessed a power line right of way across the property without proper title. Lake contended the power company should either remove the line or purchase a servitude for a fixed price. The supreme court classified an electrical transmission line as a discontinuous apparent servitude because it requires an act of man to be exercised and held under

8

La.Civ. Code art. 766, such a servitude could only be acquired by title.  Although the

plaintiff strongly urged overruling St. Julien on constitutional grounds, the supreme

court declined, instead resting its decision on codal provisions.   The court stated:

> Consequently, St. Julien v. Morgan Louisiana & Texas Railroad Co., 35 La.Ann. 924 (1883); Gumbel v. New Orleans Terminal Co., 190 La. 904, 183 So. 212 (1938); Gumbel v. New Orleans Terminal Co., 197 La. 439, 1 So.2d 686 (1941) and those cases depending on the 'St. Julien" doctrine are overruled, insofar as they conflict with the views herein expressed.  The return to the Civil Code provisions governing the establishment of servitudes, and the abandonment of the deviant and conflicting jurisprudence, is important to the clarity and predictability of the law.  Only clearly established public necessity should influence the court to perpetuate the St. Julien doctrine.  Its existence at one time might have been excused by the fear that important public services might have been interrupted if a landowner were sustained in his contention that a discontinuous servitude could only be established by title.  Not so today.  However, the St. Julien doctrine has become a rule of property, probably relied on by utilities since its establishment. Because the doctrine has been so entrenched and repeatedly affirmed by this court, the ruling in this case, as to property no involved in this suit, will be prospective only, affecting conduct occurring after the finality of this judgment.

*Id.* at 918.

Justice Tate concurred "insofar as we overrule the St. Julien doctrine as not

authorized by our civil code." *Id.*  However, he disagreed with the result reached by

the majority opinion,  arguing a power line is a continuous apparent servitude which

can be acquired by a ten year prescriptive period.

Within months after the *Lake* decision, the legislature enacted La.R.S. 19:14,

which provides in relevant part:

> In the case where any corporation referred to in Section 2 of this Title has actually, in good faith believing it had the authority to do so, taken possession of privately owned immovable property of another and constructed facilities upon, under or over such property with the consent or acquiescence of the owner of the property, it will be presumed that the owner of the property has waived his right to receive just compensation prior to the taking, and he shall be entitled only to bring an action for judicial determination of whether the taking was for a public and necessary purpose and for just compensation to be determined in accordance with Section 9 hereof, as of the time of the

9

taking of the property, or right or interest therein, and such action shall proceed as nearly as may be as if the corporation had filed a petition for expropriation as provided for in Section 2.1 of this Title.

A corporation is defined in La.R.S. 19:2 as:

(6) Any domestic or foreign corporation created for the piping and marketing or natural gas for the purpose of supplying the public with natural gas or any partnership, which is or will be a natural gas company or an intrastate natural gas transporter as defined by federal or state law, composed entirely of such corporations or composed of the wholly owned subsidiaries of such corporations.
. . .

(8) All persons included in the definition of common carrier pipelines as set forth in R.S. 45:251.

Louisiana Revised Statutes 45:251 defines common carrier as

[A]ll persons engaged in the transportation of petroleum as public utilities and common carriers for hire; or which on proper showing may be legally held a common carrier from the nature of the business conducted, or from the manner in which such business is carried on.

Louisiana Revised Statutes 45:254 provides in relevant part:

All persons included in the definition of common carrier pipe lines as set forth in R.S. 45:251 have the right of expropriation with authority to expropriate private property under the state expropriation laws for use in its common carrier pipe line business, and have the right to lay, maintain and operate pipe lines, together with telegraph and telephone lines necessary and incident to the operation of these pipe lines, over private property thus expropriated, and have the further right to lay, maintain and operate pipe lines along, across, over and under any navigable stream or public highway, street, bridge or other public place, and also have the authority, under the right of expropriation herein conferred, to cross railroads, street railways, and other common carrier pipe lines by expropriating property necessary for the crossing under the expropriation laws of this state.

Moreover, the right of expropriation by a public or quasi public corporation for

a necessary public purpose is provided for in Article 1, § 4 of the Constitution of

1974, which provides in relevant part:

Property shall not be taken or damaged by any private entity authorized by law to expropriate, except for a public and necessary purpose and with just compensation paid to the owner; in such proceedings, whether the purpose is public and necessary shall be a

10

judicial question.

Under these provisions "a landowner who consents or acquiesces to construction on his property by an entity with expropriation powers, thereby waives the right to prior compensation. The owner may thereafter bring an action for just compensation with the amount of recovery fixed as of the time of the taking. Additionally, if the occupation is by a private entity with expropriation powers, the landowner may subsequently challenge the necessity and public purpose of the taking." *Cancienne v. Lafourche Parish Police Jury*, 423 So.2d 662, 648 (La.App. 1 Cir. 1982). In order for the corporation to prevail there must be: (1) A public or quasi public body with powers of expropriation; (2) the landowner's consent or acquiescence; and (3) construction of a facility in the public interest or for a public and necessary purpose. *Id.*

Currently, most cases arise when a corporation (public or quasi public) files an expropriation proceeding and the landowner challenges the nature of the company and the public purpose for the project. *See Concha Chemical Pipeline v. E.B. Schwing, III.*, 2001-2093 (La.App. 1 Cir. 9/27/02), 835 So.2d 543; *Coleman v. Chevron Pipeline Co.,* 94-1773 (La.App. 4 Cir. 4/24/96), 673 So.2d 291, *writ denied*, 96-1784 (La. 11/1/96), 681 So.2d 1259; *Town of Vidalia v. The Unopened Succession of Ruffin,* 95-580 (La.App. 3 Cir. 10/4/95), 663 So.2d 315. However, in a few cases, as in the current dispute, the company has already taken possession of the privately owned property and the landowner sues to have the company evicted and to receive damages. *See Cancienne v. Lafourche Parish Police Jury*, 423 So.2d 662 (La.App. 1 Cir. 1982); *Louisiana Power and Light Company v. Holmes,* 422 So.2d 684 (La.App. 3 Cir. 1982); *Acadian Gas Pipeline System v. Bourgeois*, 04-578 (La.App. 5 Cir. 11/30/04), 890 So.2d 634, *writ denied*, 04-3204 (La. 3/11/05), 896 So.2d 69.

In both types of cases, in order to prevail, the entity seeking a servitude must establish itself as a public or quasi public body with powers of expropriation and it must establish the construction of a facility in the public interest or for a public and necessary purpose. If the corporation has already taken possession of the property, under *St. Julien* and La.R.S. 19:14, an additional element of landowner consent or acquiescence must be present. In *Cancienne,* the court found the landowners' predecessor had consented to grant access to and from a pumping station to the town and parish. The court found the existence of a servitude. However, in *Louisiana Power and Light Company*, the court found consent by the landowner was not given and no servitude was established.

*Acadian Gas Pipeline System*, is an example of a quasi public corporation circumventing the consent requirements of La.R.S 19:14 by using the expropriation statute after the fact of possession. In a prior suit, Bourgeois, the landowner, sued Louisiana State Gas Corporation (predecessor to Acadian Gas Pipeline System) for trespass for the construction of a four-inch pipeline across Bourgeois' property. At the time of the installation, Bourgeois objected and filed a trespass action. The gas company relied on the St. Julien Doctrine and La.R.S. 19:14. The trial court held the gas company failed to prove Bourgeois consented to the construction of the four-inch pipeline, therefore, *St. Julien* and La.R.S. 19:14 were inapplicable and the company was liable for trespass. The damage issue was not addressed at that time. While the trespass action was on appeal, the gas company filed an expropriation suit against Bourgeois seeking to acquire a permanent servitude. The expropriation suit went to trial one week after the trespass decision was affirmed on appeal. The second trial court granted the servitude in favor of the gas company finding it possessed expropriating authority, there was a public necessity for the expropriation and the gas

company made a good faith offer to purchase the servitude prior to construction. Further, the court found Bourgeois failed to prove the pipeline route selection at the time of the initial construction was in bad faith. The appellate court affirmed the decision establishing the servitude.

We turn now to an examination of the facts in the case at bar to determine the applicability of the St. Julien Doctrine and La.R.S. 19:14.

*Public or Quasi Public Body With Powers of Appropriation*

Placid contends it and its predecessor, Placid Oil Company, fall within the definition of common carrier pipelines as defined in La.R.S. 45:251 and are therefore specifically granted expropriating authority by La.R.S. 19:2. In support of its position, Placid submits the affidavits of Dennis Cernosek, a current Placid employee, and Bobby Joe Ganey, a retired Placid employee who was formerly manager of the Searcy facility. Mr. Cernosek testified Placid and its corporate predecessors are the owner and operators of an extensive system of crude oil gathering lines in LaSalle Parish. This system linked over 400 miles of gathering lines and pipelines, servicing over 300 wells from over fifty separate operators. In addition, Placid owned and operated the Searcy-Boyce pipeline which was used to transport up to 12,000 barrels of crude oil per day from the Search gathering facility in LaSalle Parish to the Exxon common carrier pipeline on the Red River in Rapides Parish. Placid purchased crude oil from operators throughout LaSalle Parish at the well head and transported it to its facility in Searcy. Generally, the cost of collecting and transporting crude oil was calculated into the price paid for the crude oil. From 1951 to 1998, Placid estimated it collected and transported over 320,000 barrels of oil, produced by six different producers, through the pipeline located on the property.

Mr. Ganey testified he was employed by Placid from 1959 until his retirement

13

in 1998. The last eleven years with Placid were spent as pipeline superintendent overseeing crude oil collection and transportation in Louisiana. Mr. Ganey testified crude oil was gathered from the individual wells by gathering lines and then transported to a centralized production facility. From these production facilities, the crude oil was transported by pipeline or truck to Placid's central facility at Searcy in LaSalle Parish. From Searcy, the crude oil was transported by a large pipeline to Boyce and from there to refineries all over the South. The pipeline in dispute was originally constructed to collect and transport crude oil from Arkansas Fuel Oil Mills #1 Well located on the Crooks property and was in service when Mr. Ganey joined the company. When the well was plugged, the pipeline continued to service other wells not located on the property. In 1998, the pipeline was physically removed from the property and the surface of the property was restored to its former condition.

The Crooks contend the pipeline was a gathering line specifically for Placid's individual use and was not a common carrier pipeline registered with the Louisiana Public Service Commission. This argument was addressed in *Dixie Pipeline Co. v. Barry*, 227 So.2d 1 (La.App. 3 Cir. 1969), *writ refused* 335 La.145, 229 So.2d 731 (La. 1970). Dixie Pipeline Company sued to obtain a servitude for the construction of a gas pipeline across the landowners property in St. Martin Parish. The facts indicate Dixie Pipeline operated a system of pipelines extending from Texas to North Carolina. The pipelines are used exclusively to carry propane gas. Dixie does not purchase or own the propane gas which it carries in its pipelines. It accepts all propane gas tendered to it for transportation. The main pipeline operated by Dixie runs through St. Martin Parish, and a loading facility is maintained on that line near Breaux Bridge. Dixie sought to obtain a servitude to construct an eight-inch pipeline from that loading facility to a plant in Anse La Butte. The Anse La Butte facility is

owned by Wanda Petroleum, Placid Oil Company, and Getty Oil Company. The landowners asserted Dixie does not possess the power of expropriation because it is not a public utility since it is not subject to the general jurisdiction of the Louisiana Public Service Commission. The landowners also claimed Dixie is not a common carrier because it does not carry propane gas for all people indifferently. The trial court held Dixie is a common carrier and the appellate court affirmed, stating:

> It is true that Dixie is not subject to the general jurisdiction of the Louisiana Public Service Commission, but the reason for that is that it is engaged in Interstate commerce, and thus it is subject to the general jurisdiction of the Interstate Commerce Commission, rather than the Louisiana Public Service Commission. This circumstance, however, does not deprive it of its right to expropriate. Calcasieu & S. Ry. Co. v Bell, 224 La. 269, 69 So.2d 40 (1953); Texas Gas Transmission Corporation v. Hebert, 207 So.2d 368 (La.App. 3d Cir. 1968); Texas Eastern Transmission Corporation v. Terzia, 138 So.2d 874 (La.App. 2d Cir. 1962).
>
> In Texas Eastern Transmission Corporation v. Terzia, supra, our brothers of the Second Circuit Court of Appeal appropriately stated "* * * the right of expropriation is dependent not upon the public character and nature of the corporation but upon the public purposes and public interest which are served by such corporation." In our opinion Dixie must be classified as a common carrier, as that term is defined in LSA-R.S. 45:251(1) and as it is used in LSA R.S. 45:254, even though it is subject to the general jurisdiction of the Interstate Commerce Commission rather than the Louisiana Public Service Commission.

*Id*. at 6.

We, therefore, reject the Crooks' restricted view of the nature of the Placid's pipeline business and the intent of the statute. Louisiana Revised Statutes 45:251defines common carrier as "all persons engaged in the transportation of petroleum as public utilities and common carriers for hire; or which on proper showing may be legally held a common carrier from the nature of the business conducted, or from the manner in which such business is carried on." The line was used by Placid in 1951 to transport oil from Mills Well #1 and, prior to its removal, was linked to a parish-wide system of pipelines transporting oil to a facility in Searcy.

15

The fact that only Placid used this particular pipeline does not thereby place it outside the definition of common carrier for hire. The nature of Placid's business is the transportation and sale of crude oil to refining facilities. We find Placid falls within the definition of common carrier for hire with powers of expropriation. This finding is consistent with the jurisprudence involving other pipeline companies. *See Coleman v. Chevron Pipeline Company*, 94-1773 (La.App. 4 Cir. 4/24/96), 673 So.2d 291.

*Landowners' consent or acquiescence*

The Crooks contend the McCutchens were not aware of the existence of the pipeline and therefore did not consent to its construction or use. We disagree. In 1939, the Crooks ancestors in title, granted an oil, gas and mineral lease which was eventually assigned to Arkansas Fuel Oil Company. This lease necessarily involved the laying of pipe to transport oil from the well to an off-site facility for refining. In 1940, Mills #1 Well began production. From 1940 to 1954, this well produced revenues and Mills heirs were compensated for the discovery of oil on the property. In 1951, Placid contracted with Arkansas Fuel Oil Company to transport the oil to a refinery for production and use by the public. When the well was plugged, Placid linked the pipeline to other wells located throughout the parish. In 1972, Ms. McCutchen re-leased the property to Placid in the hopes of discovering an additional reservoir of oil on the property. There is no question, Mr. Mills, and later, Ms. Cutchen initially consented and/or acquiesced in the construction of a pipeline and other structures necessary to obtain, produce and transport oil from their property. It was in their own best interest to do so.

*Construction in the Public Interest or Use for a Public Purpose*

The Crooks contend the pipeline was constructed solely for Placid's use and

16

not for a necessary public purpose. The Crooks contend the elaborate system of gathering lines, which Placid maintained in LaSalle Parish, was for its own competitive advantage, by reducing transportation costs, and was not constructed or used for a necessary public purpose or in the public interest. A similar argument was asserted in *Dixie Pipeline Co. v. Barry*, 227 So.2d 1 (La.App. 3 Cir. 1969), *writ refused* 335 La.145, 229 So.2d 731 (La. 1970), wherein the plaintiffs argued the pipeline served only private interests and a privately owned plant. The appellate court rejected that argument, stating:

> While it is true that the proposed pipeline will connect a privately owned plant with plaintiff's pipeline, the effect of the new line will be to transport large quantities of propane gas from the plant to a large market in several states. Also, as we have already noted, the promix plant receives "raw stream" from many producers in that area. The raw stream received from these producers is separated at the plant and the propane is then transported by means of pipelines to meet the demands of thousands of consumers. A large number of producers as well as many consumers will be benefitted by the new facility.

*Id*. at 7. *See also United Gas Pipe Line Company v. Nezat*, 136 So.2d 76 (La. App. 3 Cir. 1962) where this court found the pipeline company proved public necessity and purpose for its expropriation of a servitude for the transmission of natural gas.

In *Town of Vidalia v. The Unopened Succession of Ruffin*, 95-580 (La.App. 3 Cir. 10/4/95), 663 So.2d 315, this court provided a definition of "public purpose." The landowners alleged the expropriation of their property by the Town of Vidalia was not for a public purpose. This court disagreed and stated:

> Defendants in the case sub judice contend that in order to show a public purpose, there must be a "general public right to a definite use of the property, as distinguished from a use by a private individual or corporation which may prove beneficial or *profitable to some portion of the public." River & Rail Terminals, Inc. v. Louisiana Ry. & Nav. Co.*, 171 La. 223, 130 So. 337 (1930). Despite this restrictive language, the Louisiana jurisprudence has not defined "public purpose" so narrowly. See *Texas Pipe Line Co. v. Stein,* 190 So.2d 244 (La.App. 4 Cir. 1966), *reversed on other grounds*, 250 La. 1104, 202 So.2d 266 (1967) ("'actual public use' is not the criteria by which public purpose is determined"). Rather, any allocation to a use resulting in advantages to the public at large will suffice to constitute a public purpose. Moreover,

a use of the property by a private individual or corporation, when such use is merely incidental to the public use of the property by the state of its political subdivision, does not destroy an otherwise valid public purpose.

*Id.* at 319.

In *City of New Orleans v. New Orleans Land Co.*, 173 La. 71, 136 So. 91, the supreme court defined public use, as follows:

'No general definition of what degree of public good will meet the constitutional requirements for a 'public use' can be framed, as it is in every case a question of public policy. The meaning of the term is flexible and is not confined to what may constitute a public use at any given time, but in general it may be said to cover a use affecting the public generally, or any number thereof, as distinguished from particular individuals. Some courts have gone so far in the direction of a liberal construction as to hold that 'public use' is synonymous with 'public benefit,' 'public utitlity' or 'public advantage,' and to authorize the exercise of the power of eminent domain to promote such public benefit, etc., especially where the interests involved are of considerable magnitude, and it is sought to use the power in order that the natural resources and advantages of a locality may receive the fullest development in view of the general welfare.'

*Id*. at 74 *quoting* Corpus Juris, vol. 20, p. 551 et seq.

In *Calcasieu & S. Ry. Co. v. Bel*, 224 La. 269, 69 So.2d 40, the supreme court recognized that the construction of the railroad "will serve the public, and that the public may use and enjoy its facilities; that the construction of the road will be a public advantage and will tend to enlarge the resources, increase the industrial energies, and promote the productive powers of a considerable number of inhabitants or businesses of a section of this state, and manifestly will contribute to the general welfare and prosperity of the community in which it is located." *Id.* at 278.

We find despite any competitive advantage to Placid, use of the pipeline to efficiently and economically transport oil to various refineries in the State benefits the public by increasing the availability of the oil and reducing costs to the consumer.

In *Texas Pipe Line Co. v. Stein*, 190 So.2d 244 (La.App. 4 Cir. 1966), *reversed*

18

*on other grounds*, 250 La. 1104, 202 So.2d 266 (1967), the appellate court recognized the "tremendous public benefits derived from the petroleum industry in the State of Louisiana." The court stated:

> Perhaps no other resource is more important to the State's economy, and the public carrier pipelines which serve that industry are public utilities without which this all-important industry could not have been developed to its present significance. The public advantage resulting from an enlargement of the resources of the State, increasing available industrial energy and promoting the productive powers of a considerable number of citizens, was recognized by our Supreme Court as a contribution to the welfare and prosperity of the community, and was held to be sufficient proof of public purpose to justify the taking of private property by expropriation. *Calcasieu & So. Ry. v. Bel,* 224 La. 269, 69 So.2d 40 (1953).

*Id.* at 251.

**DECREE**

Based on the foregoing review of the evidence, we find Placid Oil Company met the requirements for the application of the St. Julien Doctrine, codified in La.R.S. 19:14. Therefore, we affirm the decision of the trial court granting a partial summary judgment in favor of Placid Refining Company, dismissing claims relating to damages for trespass, loss of use, rental value, timber trespass and attorney's fees. The Crooks are limited to an action for compensation based upon the value of the right of way taken as of the date of taking. All costs of this appeal are assessed to Steve and Era Lea Crooks.

**AFFIRMED.**