528 So.2d 626 (1988)
Ira L. CAMPBELL, Sr., et ux., Plaintiffs-Appellees,
v.
LOUISIANA INTRASTATE GAS CORPORATION, Defendant-Appellant.
No. 19557-CA.
Court of Appeal of Louisiana, Second Circuit.
May 4, 1988.
*627 Gahagan & Gahagan by Russell E. Gahagan, Natchitoches, for defendant-appellant.
Donald G. Horton, Coushatta, for plaintiffs-appellees.
Before MARVIN, FRED W. JONES, Jr. and NORRIS, JJ.
MARVIN, Judge.
The defendant private utility appeals a judgment awarding damages to the landowners, whose land defendant entered in 1985 to rework a 60-year-old underground gas pipeline. The issues concern whether defendant had the right to enter the property over plaintiffs' protests of trespass and whether the award for the loss in crop productivity is excessive and subject to reduction because of the landowners' failure to mitigate their damages. We also consider defendant's exception of prescription, timely filed in this court. CCP Arts. 927, 2163.
We amend the judgment to reduce the damage award from $21,280 to $3,000.

FACTS
The gas pipeline extends between Natchitoches and Logansport through about one mile of Red River Parish farmland which plaintiffs Mr. and Mrs. Campbell acquired in 1943. The pipeline was apparently built in the late 1920's while Clarence Hollingsworth owned the land. Hollingsworth granted a right-of-way in 1926 to two individuals who sold their interest to Gulf Public Service Company in 1927. Gulf merged with Central Louisiana Electric Company in 1951. The defendant utility acquired CLECO's gas business and rights-of-way in a 1958 exchange.
While Hollingsworth owned the land, he mortgaged it to Prudential Insurance Company. The litigants do not dispute that this mortgage was recorded in the public records before Hollingsworth granted the pipeline right-of-way in 1926.[1]
Prudential foreclosed on the Hollingsworth mortgage and acquired the property by sheriff's deed in 1935. Prudential sold to Mr. and Mrs. Campbell in 1943.
Mr. Campbell knew the pipeline went across the property when he bought it. He later received royalties from the sale of gas marketed from wells on his property through this pipeline. He assumed there was a valid pipeline right-of-way until he was advised otherwise by his attorney in 1984. When defendant notified him in 1985 of proposed operations to repair the pipeline and bury it deeper in the ground, Campbell replied that defendant would have to negotiate a right-of-way agreement with him before entering the property. Defendant reworked the pipeline over Campbell's protests without such an agreement.
The Campbells sued, seeking removal of the pipeline and alternatively, damages for bad faith trespass and loss of productivity *628 of the farmland affected by the reworking operations.
The trial court found that plaintiffs acquired the land free of the 1926 conventional servitude because that servitude was primed by the 1925 mortgage and was extinguished by Prudential's foreclosure in 1935. Although the 1925 mortgage filed in evidence describes other property, defendant agrees and does not dispute that Prudential's 1935 foreclosure of property later sold to plaintiffs extinguished the conventional servitude. This conclusion is correct if Hollingsworth mortgaged this property to Prudential before he granted the servitude. CC Art. 721; CCP Art. 2372. We shall assume that Hollingsworth granted the servitude after the mortgage because defendant is not relying on the conventional servitude as the source of its right to enter the land in 1985.
Defendant contends that its right to use and maintain the pipeline after the foreclosure, and particularly in 1985, arises from the St. Julien Doctrine. This doctrine, now statutorily recognized, provides a method of acquiring utility servitudes without formal expropriation proceedings when a utility company has used private property in the public interest in good faith and with the landowner's consent or acquiescence for a period of time. LRS 19:14; St. Julien v. Morgan L. & T. R. Co., 35 La.Ann. 924 (1883).
The trial court declined to apply this doctrine, but paradoxically awarded plaintiffs $5,280 as the value of the land "expropriated or taken" for the pipeline because "the line nonetheless existed." The judgment also awarded plaintiffs $1,000 for defendant's entry on the property "at its own risk" over Campbell's protests, and $15,000 for the loss of farmland productivity.
On appeal, defendant re-urges the St. Julien Doctrine as the source of its right to use and maintain the pipeline and contends plaintiffs' claims for the "taking" and for property damage have prescribed under LRS 19:2.1B.
We find that defendant's entry on the property in 1985 was lawful and reverse the $1,000 trespass award. We reverse the $5,280 award for the value of the property "taken" under LRS 19:2.1B. The physical damage demand arising out of the reworking in 1985 has not prescribed under LRS 9:5624 and will be considered.

LAWFUL ENTRY
In St. Julien v. Morgan L. & T. R. Co., supra, the landowner claimed rent from the railroad which had built and operated a railway across plaintiff's land without purchasing or expropriating the property. The court found that the railroad had acquired a servitude for the railway by taking and using the property for a quasi-public work with the landowner's acquiescence. The landowner could not claim rent or trespass damages, nor demand removal or prevent use of the railway, but could claim compensation for the value of the property taken. 35 La.Ann. at 925-6.
Almost 100 years later, in Lake, Inc. v. Louisiana Power & Light Company, 330 So.2d 914 (La.1976), the court overruled St. Julien to the extent that it allowed discontinuous servitudes [those requiring an act of man to be exercised, such as electric transmission lines and natural gas pipelines] to be created by unopposed use and occupancy by a corporation with the power of expropriation. When Lake was decided, the Civil Code expressly provided that discontinuous servitudes, whether apparent or non-apparent, could be established only by title and not by possession, even if immemorial. Former CC Art. 766. The court in Lake disapproved of St. Julien because it circumvented this codal provision, while recognizing the longstanding reliance on the St. Julien Doctrine as a court-tested and approved method of acquiring servitudes. The Lake decision was made prospective only and affected conduct occurring after its finality. 330 So.2d at 918.
Within months of the Lake decision, the Legislature enacted LRS 19:14, which provides in part:
In the case where any corporation referred to in Section 2 of this Title has actually, in good faith believing it had the authority to do so, taken possession *629 of privately owned immovable property of another and constructed facilities upon, under or over such property with the consent or acquiescence of the owner of the property, it will be presumed that the owner of the property has waived his right to receive just compensation prior to the taking, and he shall be entitled only to bring an action for judicial determination of whether the taking was for a public and necessary purpose and for just compensation ... as of the time of the taking of the property, or right or interest therein ...
Among the corporations included in § 2 are corporations created for the piping and marketing of natural gas for the purpose of supplying the public. § 2(5). The term "property" as defined in § 1 means "immovable property, including servitudes and other rights in or to immovable property." These definitions were already in the statutes when § 14 was enacted to adopt the St. Julien Doctrine.
In 1977 Civil Code revisions, the legislature removed the continuous/discontinuous distinction in the classification of servitudes but retained the apparent/nonapparent distinction. It has been noted that the 1977 revision removed the entire foundation of the Lake decision. See Cancienne v. Lafourche Parish Police Jury, 423 So. 2d 662 (La.App. 1st Cir.1982), for a thorough discussion of St. Julien jurisprudence and legislation.
The trial court found that the doctrine as contained in LRS 19:14 did not avail defendant because plaintiffs did not consent to or acquiesce in defendant's actions and defendant was not in good faith when it entered the property without seeking a judicial determination of its rights after Campbell protested. This analysis focuses on defendant's conduct at the time of the 1985 reworking operations rather than on the prior use of the pipeline by defendant and its predecessors without objection for over 40 years after plaintiffs acquired the property in 1943.
Mr. Campbell acknowledged he did not protest the pipeline's presence on his property until 1984. The pipeline has existed and has been maintained since the late 1920's. We have no evidence whether Prudential, the foreclosing creditor in 1935 and plaintiffs' vendor in 1943, acquiesced in or opposed the pipeline's presence. We do know that plaintiffs did not object to the pipeline between 1943 and 1984, and that they benefited from the gas marketed through the pipeline from wells on their property.
On this record, we find that defendant used the existing pipeline in good faith with plaintiffs' acquiescence for many years and had the legal right to enter the property to rework the pipeline in 1985. St. Julien, supra; LRS 19:14. We must find that the trial court erred in awarding trespass damages.

PRESCRIPTION
LRS 19:14 directs that the landowner's action for compensation for the taking is governed by the procedural provisions of § 2.1. Paragraph B of § 2.1 allows a two-year prescriptive period for all "claims for property by, or for damages to the owner caused by the expropriation of property ... commencing on the date on which the property was actually occupied and used for the purposes of the expropriation." This statute clearly bars the trial court's award for the value of the property "taken" for the pipeline. See and compare Brooks v. New Orleans Public Service, 370 So.2d 686 (La.App. 4th Cir.1979), writ denied.
Plaintiffs claimed and were awarded damages for loss of productivity of farmland near the pipeline because defendant filled and did not re-dig a drainage ditch which serviced the area. This claim is not governed by Title 19 but by LRS 9:5624. When this suit was filed in December 1985, a few months after the reworking, § 5624 provided:
When private property is damaged for public purposes any and all actions for such damage are prescribed by the prescription of two years, which shall begin to run when the damages are sustained.
*630 The statute was amended in 1987 to change the beginning of the prescriptive period from the time when damages are sustained to the time when the public work is completed and accepted. Plaintiffs' damage claim is timely under either law. See and compare Miller v. Colonial Pipeline Company, 173 So.2d 840 (La.App. 3d Cir.1965), writ denied.

DAMAGES
The reworking was done in the fall of 1985, when a cotton crop was growing over and near the pipeline. The surface over the pipeline, measuring one mile by 60-80 feet, had cotton and corn bases and "superior" topsoil. Defendant cleared the ground with a backhoe and did not preserve or separate the topsoil, the identity and quality of which became mixed with other dirt when the pipeline was covered again. Defendant filled and did not re-dig a nearby ditch which drained cotton fields. Cotton is a dry-weather crop which cannot tolerate excessive water. Rainy weather in the fall of 1985 continued into the spring of 1986, when new crops were planted. It was shown that productivity of cotton on 20 acres decreased in 1986 because of the drainage problem created in 1985.
About six weeks after this action was filed in December 1985, defendant sought written permission from plaintiffs to go back on the property to "shape up the right-of-way" and to remove any drainage obstructions. Mr. Campbell chose to ignore this request and another request which defendant sent about two months later, both of which offered to restore the surface to its condition before the work was done.
Campbell's tenant, James Herring, farmed the land in 1985 and paid Campbell $55,000 cash rent for that year. Defendant paid Herring $5,000 for the 1985 crop damage. In 1986, Herring and Campbell began sharing the farm income and expenses, with Herring having a 60 percent share and Campbell 40 percent. Herring testified at trial in December 1986 but did not make a claim for his share of the 1986 crop losses. See and compare Oswalt v. Irby Const. Co., 424 So.2d 348 (La.App. 2d Cir.1982).
According to Herring, the 20 acres of cotton land affected by the poor drainage produced only 100 pounds of lint per acre in 1986, compared to 500 pounds per acre in 1985. The established government price for cotton was 81.5 cents per pound. The loss of 8,000 pounds (400 pounds per acre X 20 acres), at this price, totals $6,520. Forty percent of this amount is $2,608.
Herring testified this loss of productivity would continue in future years unless proper drainage was restored. Campbell, however, refused defendant's offers to remedy the damage to the drainage ditch in early 1986 before that year's crop was planted and has not shown the cost to remedy the problem. The trial court awarded plaintiffs $15,000 on this claim.
In exercising its right to enter the property, defendant had the duty to act with reasonable care to minimize crop damage on and off the right-of-way. CC Art. 745; Oswalt v. Irby Const. Co., supra. Defendant breached this standard of care when it obstructed the ditch and left the property without removing the drainage obstructions.
On the other hand, once the drainage was impaired, plaintiffs had the duty to exercise reasonable diligence and ordinary care to minimize their resulting damages. An injured plaintiff is not required to make substantial expenditures of his own funds or incur substantial risk to avoid the consequences of the defendant's conduct, but must use common sense, good faith and fair dealing once the damage has been inflicted. Aultman v. Rinicker, 416 So.2d 641 (La.App. 2d Cir.1982).
Defendant's first offer to restore the surface and remove drainage obstructions was made before the 1986 crops were planted. Had Campbell entertained defendant's offer, he would have incurred no substantial risk or expense and reduced the likelihood of crop damage in 1986 and thereafter from excessive water. His candid testimony shows that he stubbornly and obstinately ignored defendant's offers:

*631 [My attorney] phoned me and told me he had this letter, and I went by there and I read it. He asked me what to say and I told him that they went in there on their toughness, when they went in there and messed it up. And if they wanted to come back in there and fix it on their toughness, all right. I wasn't going to give them any permission.
Even if Campbell was in good faith in believing defendant had no right to enter the property initially, he did not exhibit the good faith and fair dealing which the law requires of an injured plaintiff after the defendant has inflicted damage. Compare factually, Aultman v. Rinicker, supra.
On this record, the $15,000 award for "loss of productivity" is patently excessive and an abuse of the trial court's great discretion in assessing damages. When we consider plaintiff's failure to minimize his damage, we deem plaintiffs are entitled to no more than $3,000 for crop losses caused by defendant. The total 1986 crop loss according to plaintiff was $6,250, plaintiffs' "share" of which was 40 percent. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). Plaintiffs introduced no evidence as to the cost of restoring the quality of the land or re-digging the ditch and have not appealed the judgment. Under these circumstances, we shall reduce the award to $3,000.

CONCLUSION
We amend the judgment to reduce plaintiffs' recovery from $21,280 to $3,000. As amended, the judgment is affirmed. Costs of the appeal are assessed one-half to defendant and one-half to plaintiffs.
NOTES
[1] We note, however, that the 1925 mortgage filed in evidence affects property in Sections 8 and 9 of Township 12 North, Range 10 West. The right-of-way agreement and the deeds in plaintiffs' chain of title describe land in Section 19, T12N-R10W and Section 24, T12N-R11W. From these exhibits it does not appear that these acts and the 1925 mortgage affected the same property.