**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
September 18, 2013

Lyle W. Cayce
Clerk

No. 12-30741

GULF AND MISSISSIPPI RIVER TRANSPORTATION COMPANY, LIMITED,

Plaintiff-Appellant,

v.

BP OIL PIPELINE COMPANY, formerly known as Sophio Pipeline Company,

Defendant-Appellee.

Appeal from the United States District Court
for the Middle District of Louisiana

Before ELROD and HIGGINSON, Circuit Judges, and MARTINEZ, District Judge.[*]

JENNIFER WALKER ELROD, Circuit Judge:

This is an action for an accounting of a share of profits allegedly owed to Gulf and Mississippi River Transportation Company ("G&M") because BP Oil Pipeline Company ("BP") operated a pumping station on land the companies co-owned. The express servitude that initially allowed for the pumping station expired in 1980. Although negotiations to extend the servitude failed, BP continued to operate the station until 2006. In 2010 G&M sued BP, asserting that it is a co-owner of both the pumping station and the land on which it sits and seeking an accounting for all revenue and profit that BP made from the pumping station. BP moved for summary judgment, contending that the *St.*

---

[*] District Judge of the Western District of Texas, sitting by designation.

No. 12-30741

*Julien* Doctrine prescribed G&M's claim and contesting G&M's assertion of co-ownership. The district court granted summary judgment for BP. We REVERSE the district court's judgment and REMAND for further proceedings.

I.

In 1957, G&M acquired a 20% undivided fee interest in a 5.19 acre tract on Grand Terre Island ("the Tract"). A few years later, in 1960, Gulf Refining Company ("Gulf") obtained a right-of-way servitude ("the Servitude") from all owners of the Tract "for the purpose of constructing, maintaining and operating thereon a booster pump[ing] station to be used in connection with the transportation by pipe line of oil, gas, water, steam, or any material or substance which can be conveyed through a pipe line." The Servitude, by its own terms, had a limited duration:

> The rights herein granted shall be for a term of 20 years from and after the date hereof, after which term, all of said rights shall cease and terminate. Grantee shall have a period of 90 days after the expiration of this grant in which to remove its property and equipment which may have been placed on [the Tract].

Important to this case, the Servitude did not specify what would happen to the grantee's "property and equipment" if it remained on the Tract after the ninety-day removal period expired.

The Servitude expired on June 24, 1980, but Gulf continued to operate the pumping station. Three months later, Gulf filed a petition to expropriate a perpetual servitude over the Tract. In its petition, Gulf alleged that it had "undertaken to conduct negotiations in good faith to purchase a right-of-way and servitude over the [Tract] . . . and to agree with [the Tract's owners] as to the term and price of said servitude, but to no avail." Gulf's petition named G&M as a co-owner of the Tract and served G&M with the petition through its

2

No. 12-30741

attorney. After that point, however, the expropriation suit essentially stopped in its tracks: G&M did not file any responsive pleadings or discovery materials. Gulf experienced trouble locating and serving other potential defendants, and neither Gulf nor any later operators of the pumping station prosecuted the suit to judgment.

Six years later, in 1986, Gulf's corporate successor, Chevron Pipeline Company ("Chevron"), sold its interest in the pumping station and attendant rights to Sohio Pipeline Company ("Sohio"), the corporate predecessor of BP. The Purchase Agreement for this sale contained a covenant regarding the "Expired Right-of-Way," which stated:

> With respect to the right-of-way granted pursuant to [the Servitude] dated August 12, 1960 by Lloyd Wright, Executor, which has expired pursuant to its terms, [Chevron] shall acquire within twelve (12) months after Closing a fee interest in the servient estate, which was subject to [the Servitude], in a proportion sufficient to secure [Sohio/BP's] right to continue the present Pipeline occupation . . . .

Chevron fulfilled its obligation under this provision in 1988 when it purchased an undivided 1.5% fee interest in the Tract, which it quickly sold to BP, through Sohio.[1] BP operated the pumping station until 2006, when it sold its interests in the pumping station and the Tract to Plains Pipeline, L.P. ("Plains").[2] From the time the Servitude expired until the time that Plains purchased BP's interests, G&M did not receive a single payment for the use of the pumping station.

---

[1] In its answer to G&M's complaint in this lawsuit, Chevron stated: "Chevron Pipeline admits that the [expropriation] lawsuit was not prosecuted to a final resolution, but further avers that this was the result of the acquisition by Chevron Pipeline of a fee interest in the property from Texaco Producing on October 11, 1988."

[2] In 2009, G&M granted Plains a servitude to operate the pumping station.

No. 12-30741

## II.

In April 2010, G&M sued Chevron and BP asserting trespass and accounting claims. G&M contended that (1) Chevron and BP committed a continuing trespass by operating the pumping station from the time the Servitude expired until Plains purchased BP's interests; and (2) BP owed G&M a share of revenue as a co-owner of the pumping station and the Tract.

Chevron and BP initially moved for summary judgment on G&M's trespass claims. They contended that, because a co-owner cannot commit trespass, the one-year prescription period for G&M's trespass claims began to run in 1988 when Chevron (and shortly thereafter BP) acquired the 1.5% interest in the Tract. G&M opposed the motions and moved for partial summary judgment, asserting that it co-owned the pumping station with BP and was therefore entitled to share in the "income, revenue, and/or profits" BP earned during the period of co-ownership from November 1988 to June 2006 (the "Relevant Period").

The district court granted summary judgment for Chevron and BP on G&M's trespass claims; it also denied G&M's cross-motion. Because the trespass claim was the only claim that G&M asserted against Chevron, the district court entered a Rule 54(b) partial final judgment for Chevron. *See* Fed. R. Civ. P. 54(b). G&M appealed the Rule 54(b) judgment and our court affirmed in an unpublished opinion. *Gulf & Miss. River Transp. Co. v. Chevron Pipeline Co.*, 451 F. App'x 372, 375–76 (5th Cir. 2011). In this appeal, G&M does not challenge the district court's ruling that its trespass claim against BP is prescribed; therefore, the trespass claims are no longer at issue.

No. 12-30741

After we affirmed the district court's ruling on the trespass claim against Chevron, BP and G&M filed cross-motions for summary judgment on G&M's remaining claim for an accounting of all revenue and profit from the pumping station during the Relevant Period. BP asserted that (1) the *St. Julien* Doctrine barred G&M's claim because it triggered a two-year prescriptive period, which had lapsed; and (2) even if the *St. Julien* Doctrine did not apply, G&M was merely a co-owner of the Tract, not the pumping station, so it had no claim for an accounting of profits from the pumping station. G&M, on the other hand, contended that (1) it became a co-owner of the pumping station when the station remained on the Tract past the ninety-day removal period specified in the Servitude; and (2) even if it is not a co-owner of the pumping station, it is entitled to an accounting of the revenues from the pumping station because it sits on the Tract in which G&M holds an undivided 20% fee interest.

The district court determined that BP never abandoned the pumping station, and therefore retains full ownership of the station. The district court next concluded that G&M failed to establish any right to profits from the pumping station under general principles of Louisiana co-ownership law. Finally, the district court found that the *St. Julien* Doctrine applied to G&M's claim against BP, and that the claim was prescribed because BP "actually occupied and used" the pumping station for more than two years before G&M filed suit. Accordingly, it granted BP's motion for summary judgment, denied G&M's motion, and entered a final judgment in favor of BP. G&M timely filed a notice of appeal, invoking our jurisdiction under 28 U.S.C. § 1291.

## III.

We review a grant of summary judgment *de novo*. *Jones v. Wells Fargo Bank, N.A.*, 666 F.3d 955, 959 (5th Cir. 2012) (citation omitted). When, as here, parties filed cross-motions for summary judgment, we review each party's

No. 12-30741

position independently, "viewing the evidence and inferences in the light most favorable to the nonmoving party." *Id.* (citation and quotation omitted). "[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuine dispute exists "if the record, taken as a whole, could not lead a rational trier-of-fact to find for the non-moving party." *Kariuki v. Tarango*, 709 F.3d 495, 501 (5th Cir. 2013) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 597–98 (1986)).

## IV.

This case turns on whether G&M is entitled to, and may still assert a claim for, an accounting of the profits that BP derived from the pumping station during the Relevant Period.[3] Louisiana substantive law governs our resolution of this issue. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

"To determine Louisiana law . . . , this Court should first look to final decisions of the Louisiana Supreme Court." *Howe ex rel. Howe v. Scottsdale Ins. Co.*, 204 F.3d 624, 627 (5th Cir. 2000) (citation omitted). If the Louisiana Supreme Court has not ruled on the issue at hand, "then this Court must make an '*Erie* guess' and 'determine as best it can' what the Louisiana Supreme Court would decide." *Id.* (quoting *Krieser v. Hobbs*, 166 F.3d 736, 738 (5th Cir. 1999)).

---

[3] At oral argument G&M clarified that it seeks an accounting only for the period from 1988 to 2006 during which it was a co-owner of the Tract.

No. 12-30741

In making an *Erie* guess, we rely on the following:

> (1) decisions of the [Louisiana] Supreme Court in analogous cases, (2) the rationales and analyses underlying [Louisiana] Supreme Court decisions on related issues, (3) dicta by the [Louisiana] Supreme Court, (4) lower state court decisions, (5) the general rule on the question, (6) the rulings of courts of other states to which [Louisiana] courts look when formulating substantive law and (7) other available sources, such as treatises and legal commentaries.

*Am. Int'l Specialty Lines Ins. Co. v. Rentech Steel, L.L.C.*, 620 F.3d 558, 564 (5th Cir. 2010) (quoting *Hodges v. Mack Trucks, Inc.*, 474 F.3d 188, 199 (5th Cir. 2006)). These principles form the backdrop for our analysis.

G&M advances two co-ownership-based theories for recovery: First, it claims that the two companies operated the pumping station as co-owners of the Tract because G&M owned an undivided interest in the Tract before BP acquired an interest in the Tract. Alternatively, G&M contends that it became "a co-owner with BP of the pumping station equipment and structures" after the ninety-day removal period expired. In response, BP asserts that G&M's claim is prescribed because G&M sued four years after BP sold the pumping station and the *St. Julien* Doctrine—with its two-year limitations period—applies. BP further contends that even if G&M's claim is not prescribed, it fails on the merits because G&M never co-owned the pumping station with BP and, therefore, is not entitled to an accounting for any profits BP obtained in connection with the pumping station. If applicable, BP's *St. Julien*-based prescription argument could be dispositive. We begin with that issue.

A.

BP asserts that a *St. Julien* servitude exists and prescribed G&M's claim. The district court agreed with BP's position but, for the reasons below, we do not. The *St. Julien* Doctrine originated as a "jurisprudentially-recognized theory involving the creation of a servitude by 'unopposed use and occupancy' by a

No. 12-30741

corporation with the power of expropriation." *Eagle Pipe & Supply, Inc. v. Amerada Hess Corp.*, 79 So. 3d 246, 267 n.54 (La. 2011); *see Concha Chem. Pipeline v. Schwing*, 835 So. 2d 543, 547 (La. App. 1st Cir. 2002) (describing the *St. Julien* Doctrine as a "jurisprudential rule . . . allowing [for] the creation of servitudes by estoppel"). The doctrine has its roots in the common law and bears the name of the case that established it. *St. Julien v. Morgan La. & Tex. R.R. Co.*, 35 La. Ann. 924 (La. 1883); *see generally* Sarah Savoia Vance, Note, *Property–Expropriation– Demise and Resurrection of the* St. Julien *Doctrine*, 51 Tul. L. Rev. 375, 375–76 (1977). In that case, the Louisiana Supreme Court held that if a landowner "permit[s] the use and occupancy of his land and the construction of a *quasi* public work thereon without resistence or even complaint," then "[c]onsiderations of public policy . . . require that in such case the owner shall not be permitted to reclaim his property free from the servitude he has permitted to be imposed upon it, but shall be restricted to his right of compensation." *Id.* at 925–26.

Louisiana courts have applied the *St. Julien* Doctrine for nearly a century. Since 1976, however, the *St. Julien* Doctrine has existed solely as a creature of statute. That year, the Louisiana Supreme Court prospectively overruled *St. Julien* and its progeny, *see Lake, Inc. v. La. Power & Light Co.*, 330 So. 2d 914, 918 (La. 1976), prompting the Louisiana legislature to codify the doctrine a few months later. *See* La. R.S. § 19:14 (2012).[4]

Section 19:14 states, in relevant part:

---

[4] We focus exclusively on whether BP has a *St. Julien* servitude under section 19:14. BP emphasizes in its briefing that it is *not* alleging the existence of a *St. Julien* servitude prior to the expiration of the Servitude in 1980; to the contrary, BP "assert[s] that [*it*] meets all of the requisites to establish a 'taking' under the *St. Julien* Doctrine." Because BP (more specifically BP's predecessor, Sohio) had no connection with the pumping station until a decade after the Louisiana Supreme Court overruled *St. Julien*, section 19:14 governs this case.

No. 12-30741

> In the case where any expropriating authority referred to in R.S. 19:2, other than the state or its political corporations or subdivisions, has actually, in good faith believing it had the authority to do so, taken possession of privately owned immovable property of another and constructed facilities upon, under, or over such property with the consent or acquiescence of the owner of the property, it shall be presumed that the owner of the property has waived his right to receive just compensation prior to the taking, and he shall be entitled only to bring an action for judicial determination of whether the taking was for a public and necessary purpose and for just compensation to be determined in accordance with R.S. 19:9, as of the time of the taking of the property, or right or interest therein, and such action shall proceed as nearly as may be as if the expropriating authority had filed a petition for expropriation as provided for in R.S. 19:2.1.

*Id.* § 19:14(B). The procedural provisions in section 19:2.1, which section 19:14 incorporates, require that "[a]ll claims for . . . damages to the owner caused by the expropriation of property . . . shall be barred by the prescription of two years commencing on the date on which the property was actually occupied and used for the purposes of the expropriation."[5]  La. R.S. § 19:2.1(B); *see, e.g.*, *Sellers v. St. Charles Parish*, 655 So. 2d 367, 371 (La. App. 5th Cir. 1995), *writ denied*, 657 So. 2d 1034 (holding that the *St. Julien* Doctrine applied and concluding that the two-year prescriptive period in section 19:2.1(B) prescribed the plaintiffs' claims for just compensation).

Although neither the parties nor the district court raised the issue, we note that there is room to question whether the *St. Julien* Doctrine would even apply to a claim for an accounting of profits or revenues, such as G&M requests here.  Louisiana courts have applied section 19:14 in cases where landowners

---

[5]  Section 19:14 also references section 19:2, which lists the types of corporate entities that have expropriation powers, including corporations that qualify as "common carrier pipelines as set forth in R.S. 45:251." La. R.S. § 19:2(8).  Section 45:251, in turn, specifies that a common carrier "includes all persons engaged in the transportation of petroleum as public utilities and common carriers for hire . . . ."  La. R.S. § 45:251(1).

No. 12-30741

seek an injunction to end occupation of their property or damages for a taking or trespass. *See, e.g.*, *Crooks v. Placid Refining Co.*, 903 So. 2d 1154,1166 (La. App. 3d Cir. 2005), *writ denied*, 920 So. 2d 242 (La. 2006); *Campbell v. La. Intrastate Gas Corp.*, 528 So. 2d 626, 629 (La. App. 2d Cir. 1988); *Sigue v. Tex. Gas Trans. Corp.*, 154 So. 2d 800, 801–03 (La. App. 3d Cir. 1963), *writ ref'd*, 244 La. 1025. The parties have not identified, nor have we found, a Louisiana decision that has applied section 19:14 where a plaintiff seeks an accounting for profits allegedly owed to it. Because we conclude that BP cannot satisfy the elements for a *St. Julien* servitude, we assume, *arguendo*, that the *St. Julien* Doctrine is applicable.

The Louisiana Supreme Court has yet to meaningfully construe section 19:14. After reviewing decisions by Louisiana's intermediate appellate courts, the district court set out the elements under the statute as follows:

> (1) The appropriating authority has been granted powers of expropriation;
> (2) The appropriating authority constructs a facility in the public interest;
> (3) The appropriating body possesses the property and constructs the facility with a good faith belief in its authority to do so;[6] and
> (4) The landowner consents or acquiesces in the taking.

---

[6] Although section 19:14(B) explicitly requires that the expropriating authority act "in good faith," Louisiana appellate courts have repeatedly omitted any reference to the good faith requirement. *See, e.g.*, *Crooks*, 903 So. 2d at 1161 (stating the elements as: "(1) A public or quasi public body with powers of expropriation; (2) the landowner's consent or acquiescence; and (3) construction of a facility in the public interest."); *Cancienne v. Lafourche Parish Police Jury*, 423 So. 2d 662, 670 (La. App. 1st Cir. 1982) (same). Louisiana case law is likewise unsettled as to the point in time the court should consider when assessing whether or not a party acted in good faith. *Compare Campbell*, 528 So. 2d at 629 (focusing on the period of pipeline use, rather than defendant's conduct at the time the pipeline was originally installed), *with Acadian Gas Pipeline Sys. v. Bourgeois*, 890 So. 2d 634, 641–42 (La. App. 5th Cir. 2004) (distinguishing bad faith at the time the pipeline was built from actions of a subsequent owner). Out of respect for our federal system, this court recognizes that its duty here is to faithfully apply Louisiana's interpretation of its own law. Luckily, we need not risk misconstruing this unsettled issue of Louisiana law today. We do not reach the issue of whether BP did show, or needed to show, good faith because we conclude that the fourth element of the *St. Julien* Doctrine is not present here.

G&M asserts that BP does not meet the second,[7] third, and fourth elements. With respect to the fourth element, we agree.

An expropriating authority claiming a *St. Julien* servitude must show the landowner's consent or acquiescence with actual knowledge of an encroaching structure. *See Holt v. City of Bossier City*, 384 So. 2d 495, 498 (La. App. 2d Cir. 1980) (quoting *Gumbel v. New Orleans Term. Co.*, 173 So. 518, 520 (La. 1937), *overruled by Lake*, 330 So. 2d at 918); *see also Cancienne*, 423 So. 2d at 672. "[P]roof of a servitude will certainly not require express consent, but may necessitate more than just the mere absence of complaints by the original landowners." *Lonatro v. Orleans Levee Dist.*, 809 F. Supp. 2d 512, 520 (E.D. La. 2011). Acquiescence requires an act "recognizing the transaction as existing; and intended, to some extent at least, to carry it into effect and to obtain or claim the benefits resulting therefrom." *Cancienne*, 423 So. 2d at 672. "[T]he issue of what is necessary to constitute consent or acquiescence is a fact-sensitive one." *Lonatro*, 809 F. Supp. 2d at 520.

Prior to 1980, BP and its predecessors operated the pumping station under the 20-year fixed-term Servitude, which expressly authorized that use.[8] Only

---

[7] G&M asserts that BP cannot satisfy the second element because it did not construct the pumping station. This argument would come as a surprise to the district court, which stated that the second element was "undisputed." The district court's statement was well-founded: G&M did not advance *any* argument in the district court regarding "construction" of the pumping station. We therefore conclude that G&M waived its argument regarding the second element of the *St. Julien* Doctrine. *See Fed. Deposit Ins. Corp. v. Laguarta*, 939 F.2d 1231, 1240 (5th Cir. 1991).

[8] This fixed-term makes the Servitude here distinct from the perpetual servitudes found in many of the cases cited by BP. By its own terms, the Servitude would come to an end after 20 years. Essentially, this creates two servitudes: the 20-year fixed-term Servitude from 1960 to 1980, and a second unauthorized "servitude" that began after the expiration of the first Servitude and exists only if BP can satisfy the elements of the *St. Julien* Doctrine. As a result, G&M's consent to the construction and use of the pumping station from 1960 to 1980 is irrelevant to the question of whether or not it consented to the second servitude for purposes of the *St. Julien* Doctrine.

No. 12-30741

after the Servitude expired did BP's actions become adverse to G&M, and only after they became adverse could the *St. Julien* Doctrine apply. We therefore focus our inquiry exclusively on whether G&M ever consented or acquiesced to use of the pumping station following the expiration of the Servitude in 1980.

A common feature in situations where Louisiana courts have found consent or acquiescence by the landowner is some affirmative act, however small, acknowledging and allowing the servitude. For instance, in *Campbell* the landowner received royalty payments for the use of the pipeline running beneath his land, and the receipt of this benefit acted as his consent or acquiescence. 528 So. 2d at 627. In contrast, the record here indicates that G&M did not take any actions that could be construed as consent or acquiescence. G&M never consented to any agreement extending the servitude past its expiration date. Indeed, Gulf's expropriation petition indicates just the opposite: G&M refused to grant a new servitude even after Gulf had "undertaken to conduct negotiations" regarding the "term and price" for a new servitude. G&M never reached an agreement giving Gulf or anyone else a servitude to operate the pumping station during the Relevant Period, as evidenced by that same unresolved expropriation action. In addition, G&M never accepted payments from BP for the use of the servitude. BP's reliance on *Campbell* is therefore misplaced: unlike the landowner in *Campbell*, G&M has not received a benefit that could be fairly characterized as consent or acquiescence to the servitude. *Id.*

Furthermore, we cannot construe G&M's inaction to be evidence of consent or acquiescence. *See Lonatro*, 809 F. Supp. 2d at 521 ("Indeed, there are Louisiana cases showing that silence is not deemed acquiescence."). In *Lonatro*, the Orleans Levee District claimed to have a *St. Julien* servitude over portions of the plaintiffs' land abutting a levee. *Id.* at 513–14. The *Lonatro* court found

12

No. 12-30741

that "the bare existence of the Levee, without the introduction of any evidence, is insufficient to demonstrate that the previous landowners acquiesced in the creation of a *St. Julien* servitude." *Id.* at 521. Here, the bare existence of the pumping station does not demonstrate G&M's consent or acquiescence to a servitude. Nor can G&M's inaction in the expropriation action serve as the basis for finding this final element. G&M was not required to make an appearance in the action, and the suit was subsequently abandoned before reaching a judgment.[9] We therefore conclude that the *St. Julien* Doctrine does not apply in this case.

B.

Because G&M's claim is not prescribed by the *St. Julien* Doctrine, we next consider whether G&M is entitled to an accounting of BP's profits from the pumping station during the Relevant Period. For essentially the same reasons stated by the district court, we agree that G&M never acquired an ownership interest in the pumping station. As a result, the resolution of this issue turns on whether those profits were the "civil fruits" of the co-owned Tract.

Under Louisiana law, "[f]ruits are things that are produced by or derived from another thing without diminution of its substance." La. Civ. Code art. 551 (2012). "There are two kinds of fruits; natural fruits and civil fruits." *Id.* The statute defines "civil fruits," as "revenues derived from a thing by operation of law or by reason of a juridical act, such as rentals, interest, and certain corporate distributions." *Id.* Unlike natural fruits, "[c]ivil fruits do not derive from the body of the principal thing; they result from legal relations having as their object the principal thing." *See* A.N. Yiannopoulos, 2 La. Civ. L. Treatise, *Property* § 40 n.2 (4th ed. 2001).

---

[9] At oral argument both parties agreed that the suit has been abandoned under Louisiana law, and that the proceeding has no legal effect.

No. 12-30741

In *Juneau v. Laborde*, the Louisiana Supreme Court explained that when a co-owner in possession derives rents or revenues from his exploitation of co-owned property, "he must account to his co-owner[s] [out of possession] for all rents or revenues he has received because, in obtaining these fruits, he acts not only for himself but also as the agent of his co-owner for the latter's just proportion." 82 So. 2d 693, 695 (La. 1955). Relying on *Juneau*, G&M contends that BP must account to out-of-possession co-owners of the Tract (including G&M) for the profits it received from that exploitation. *See id*; *see also Goodman v. Lee*, 78 F.3d 1007, 1012 (5th Cir. 1996) ("[A] co-owner has a right of action against another co-owner to recover his or her share of the fruits or products of the property held in common." (footnote omitted)); *Knoll v. Delta Dev. Co.*, 218 So. 2d 109, 113 (La. App. 3d Cir. 1969), *writ ref'd*, 220 So. 2d 460 (holding that co-owners out of possession were "entitled to recover a proportionate part of the revenues which [a co-owner in possession] received from [sales of a cotton crop that the in-possession co-owner produced]").

G&M argues that the Tract was necessary for BP to operate the pumping station, and that the profits of the pumping station are therefore the "civil fruit" of BP's exploitation of the Tract.[10] G&M reasons that the Tract served as the location for both the pumping station and the pipeline and that this particular location was crucial to BP's ability to derive profits from either. To support this argument, G&M also notes that the pumping station was actually "a collection of things, all of which are joined to the land" and asserts that the Tract was therefore "essential" to the pumping station and the profits it produced.

---

[10] G&M does not seek compensation for the value of the servitude that BP may have "taken" during the period in which it operated the pumping station on the Tract, and it does not challenge the district court's prior ruling that its trespass claim is barred. Instead, G&M seeks "an accounting from BP . . . for all revenue and profit made by BP from its use of the [Tract] by BP's operation of the pumping station."

No. 12-30741

In contrast, BP contends that the profits are the fruit of the pumping station and BP's business practices, rather than the Tract. BP argues that *Juneau*, *Knoll*, and *Goodman* are all distinguishable because the fruits in those cases (crops and royalties) were "derived directly" from the "thing" that was co-owned, while the "fruits" here (profits and revenue) were derived directly from the pumping station, which belongs solely to BP. BP's argument suggests that G&M cannot claim the profits as civil fruits if they were derived only *indirectly* from the co-owned Tract. We have found nothing to suggest that Louisiana draws such a distinction.

The district court determined that "the pumping station is not the fruit of the land on which it sits" and concluded that "G&M cannot reap the fruits and revenues from something it does not co-own." In reaching this conclusion, the district court did not specify whether it was referring to natural fruits, civil fruits, or both. We agree that the pumping station itself is not the natural fruit of the Tract. But unlike natural fruits, which are "produced by the earth or by animals," civil fruits are "revenues derived from a thing by operation of law or by reason of a juridical act . . . ." 2 La. Civ. L. Treatise, Property § 40. Here, the revenues and profits that BP derived from operating the pumping station could be characterized as the civil fruits of the pumping station, the co-owned Tract, or both. Because the district court did not clarify this issue, we think it prudent to allow it to resolve this question in the first instance. Accordingly, we reverse and remand to the district court to further consider whether the profits are civil fruits of the Tract and, if so, whether G&M is therefore entitled to an accounting.

V.

For the reasons stated above, we REVERSE and REMAND to the district court.