# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-30091

United States Court of Appeals
Fifth Circuit

**FILED**
June 29, 2018

Lyle W. Cayce
Clerk

FISK ELECTRIC COMPANY,

> Plaintiff – Appellant,

v.

DQSI, L.L.C.; WESTERN SURETY COMPANY,

> Defendants – Appellees.

Appeal from the United States District Court
for the Eastern District of Louisiana

Before KING, ELROD, and GRAVES, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

A subcontractor performed electrical work for a general contractor on a post-Hurricane Katrina federal construction project. The subcontractor alleges that the general contractor fraudulently induced it into entering a settlement agreement that released the general contractor from any claims for liability under the Miller Act—a federal statute that requires general contractors to secure payment to subcontractors on most federal construction projects. The district court granted summary judgment to the general contractor. We determine that there is a genuine issue of material fact on justifiable reliance—an element of the subcontractor's fraudulent-inducement

No. 17-30091

claim——and therefore REVERSE the district court's judgment and REMAND for further proceedings.

I.

DQSI, L.L.C., the general contractor here, contracted with the United States Army Corps of Engineers to perform work on a post-Hurricane Katrina pump station construction project. Western Surety Company issued a Miller Act payment bond on the project on DQSI's behalf. DQSI subcontracted with Fisk Electric Company; Fisk was to perform electrical work on the project. The contract allowed Fisk to assert claims for money damages for unforeseen delays not caused by Fisk. Due to delays apparently caused at least in part by adverse weather conditions, the completion of the project was delayed 464 days. Fisk asserted that it experienced significant additional expenses because of the delay, amounting to more than $400,000. Fisk invoiced DQSI for this amount but apparently was never paid. Months before filing a lawsuit, Fisk also submitted to DQSI a Request for Equitable Adjustment seeking damages for the 464 days of delay.

In 2013, Fisk sued DQSI and DQSI's surety, Western, pursuant to the Miller Act, 40 U.S.C. § 3131, *et seq.*,[1] and for breach of contract after attempts to resolve the dispute without litigation.[2] Before Fisk filed this 2013 lawsuit, Norman G. "Pat" Clyne, Fisk's supervisor of operations, met twice with DQSI representatives following Fisk's demand letter for delay damages pursuant to the Miller Act. In his affidavit, Clyne states that Stanley Lee and Scott

---

[1] "The Miller Act requires general contractors on most federal construction projects to furnish a bond for performance and to secure payment to all suppliers of labor and materials." *J.D. Fields & Co. v. Gottfried Corp.*, 272 F.3d 692, 696 (5th Cir. 2001).

[2] In accord with the parties' briefing, we generally refer to Appellees throughout simply as "DQSI," rather than as "DQSI and Western."

McCumsey, representatives of DQSI, expressed that they were uncomfortable submitting a Request for Equitable Adjustment for delay damages on Fisk's behalf. Clyne states: "I specifically asked if DQSI had already waived Fisk's rights to submit the [Request for Equitable Adjustment]. Stanley Lee and Scott McCumsey responded that it had not." In a later meeting, Lee and McCumsey apparently reiterated that DQSI had not waived Fisk's rights to submit the Request for Equitable Adjustment.

In December 2013, Clyne sent a letter to DQSI. According to the letter, Fisk had previously requested from DQSI a copy of the bilateral modifications issued to DQSI by the Corps granting the 464-day extension. When DQSI had not readily complied with the request, Fisk had obtained copies of the bilateral modifications directly from the Corps through a Freedom of Information Act (FOIA) request. The contract modification to which Clyne's December 2013 letter refers contains a "closing statement" declaring the following: "It is further understood and agreed that this adjustment constitutes compensation in full on behalf of the Contractor, its subcontractors and suppliers for all costs and markups directly or indirectly attributable to the change, for all delays . . . ." However, none of the bilateral modifications obtained through the FOIA request were signed by DQSI. According to Clyne in the December 2013 letter, "It appears from the documents that we received [through the FOIA request], that Fisk was foreclosed from seeking compensation from the Corps before Fisk and DQSI even began negotiations."

Fisk and DQSI mediated the case in April 2014. Clyne states in an affidavit that "based on the representations made at mediation by DQSI, my concerns about the [Request for Equitable Adjustment] expressed in my December 10, 2013 letter were laid to rest." Clyne states that "[b]ased on the prior representations by Mr. Lee and Mr. McCumsey and the fact that DQSI

was agreeing to submit Fisk's claims to the Corps, I believed that Fisk's claims were still viable with the Corps and there had been no prior waiver of any rights to seek equitable adjustment."

The "memorandum of agreement" signed at mediation states that "Fisk agrees to provide DQSI with a fully supported [R]equest for Equitable Adjustment that is certifiable by DQSI to [the Corps]." In the memorandum of agreement, DQSI also agreed "to submit to [the Corps] the Request for Equitable Adjustment presented by Fisk provided that DQSI will only be responsible to submit the Request for Equitable Adjustment if it is certifiable to [the Corps] and is fully supported by Fisk."[3] Fisk also agreed "to defend, indemnify[,] and hold DQSI harmless in connection with, arising from, or related to DQSI's submission of Fisk's Request for Equitable Adjustment to [the Corps]." Following mediation, Fisk submitted a Request for Equitable Adjustment nearly identical to the previous one, again seeking damages for the 464-day delay. DQSI objected that the Request for Equitable Adjustment was "not properly supported as required" by the memorandum of agreement. Following mediation, Fisk filed a motion to enforce settlement. The motion was granted, requiring DQSI to submit Fisk's Request for Equitable Adjustment within seven days of the court order. DQSI submitted a Request for Equitable Adjustment to the Corps.

In December 2014, Fisk and DQSI entered into a settlement agreement intended "to formalize the terms" of the memorandum of agreement.[4] As part of the settlement, Fisk and DQSI agreed to a mutual release in which Fisk

---

[3] As a subcontractor, Fisk had no direct relationship with the Corps and therefore relied on DQSI to submit the Request for Equitable Adjustment on its behalf.

[4] Western was not a signatory to the memorandum of agreement or the settlement agreement.

would release DQSI from any claims for the consideration of approximately $55,000. In consideration of the releases of claims, DQSI agreed "to submit a Request for Equitable Adjustment ('REA') presented by Fisk to [the Corps]." In the event that the Corps awarded funds in response to the Request for Equitable Adjustment, the settlement agreement provided that if the amount exceeded $175,000, DQSI would retain the excess funds, provided that it would not retain more than $25,000.[5] According to Clyne, "[w]ithout the representations made by Mr. Lee and Mr. McCumsey and the understanding that Fisk had a viable option to present its claims to the Corps, I would not have accepted the settlement agreement." Gregory Thomas, Fisk's in-house general counsel who executed the settlement agreement on Fisk's behalf, states in his affidavit that during negotiations he "was specifically told by representatives of DQSI that DQSI had not received payment for the work done by Fisk or for its delay damages and therefore Fisk could present a request for adjustment (REA) to obtain payment." According to Thomas, "Fisk relied on this fundamental representation by DQSI in accepting the settlement agreement . . . ."

In early 2015, the Corps informed DQSI that Fisk's Request for Equitable Adjustment, which DQSI had submitted following mediation, "does not substantiate any Government-caused delays that have not been previously addressed through bilateral modifications." About a month later, Fisk and DQSI met with the Corps to discuss Fisk's Request for Equitable Adjustment.

---

[5] In addition, the settlement agreement states Fisk's assertion that DQSI owed it approximately $488,000, together with legal costs, as a result of DQSI's alleged failure to pay Fisk. The agreement also notes that "DQSI has since asserted that it is entitled to seek liquidated damages from Fisk at the rate of $3,800.00 per day pursuant to the Subcontract as a result of delays in the Project's completion, which delays DQSI asserts were caused by Fisk . . . ."

Clyne stated that at the meeting, he "was told by the Corps that it would not entertain the [Request for Equitable Adjustment] because DQSI had settled all aspects of the modifications related to Fisk's [Request for Equitable Adjustment]." According to Clyne, this was "the first time that [he] was told that the Corps already had a final settlement with DQSI."

Fisk then filed its second lawsuit against DQSI and Western. Fisk's complaint lists four claims: (1) rescission of release; (2) a Miller Act claim against DQSI and Western; (3) an alternative claim for breach of contract against DQSI; and (4) another alternative claim for unjust enrichment. Under Claim 1, Fisk alleges that it is entitled to rescind the release of liability in the settlement agreement on the basis of fraud pursuant to Louisiana Civil Code article 3082.[6] Under Claim 2, Fisk alleges that it is entitled under the Miller Act to an action and judgment against DQSI and Western for approximately $410,000, plus interest, costs, and attorneys' fees.

DQSI moved to dismiss the lawsuit and filed a motion for summary judgment; it also sought to enforce the settlement agreement. The district court denied all three motions. The district court concluded that there was a genuine issue of material fact as to whether Fisk knew that DQSI had waived Fisk's right to delay damages. Among other things, the district court noted that Fisk "still stipulated to the submission of the [Request for Equitable Adjustment] in the Agreements, which suggests that [Fisk] had some reasonable expectation of recovery."

About a year later, DQSI filed a second summary-judgment motion. The district court determined that federal law applied, stating that "[b]ecause the claims in this case are premised on the Miller Act, federal law governs the

---

[6] This article provides that "[a] compromise may be rescinded for error, fraud, and other grounds for the annulment of contracts." La. Civ. Code Ann. art. 3082.

validity of the Agreements and thus any fraud claim that might invalidate them." However, relying on federal district court cases applying Louisiana law, the district court concluded that Fisk could not demonstrate justifiable reliance—an element of a fraudulent-inducement claim. The district court granted DQSI's summary-judgment motion, stating that "[i]n light of very convincing evidence of fraud by movant, we were unable to find an exception that would allow excusing opponent's above noted deficiencies." Fisk timely appealed.

## II.

We review a grant of summary judgment *de novo*. *Gulf & Miss. River Transp. Co. v. BP Oil Pipeline Co.*, 730 F.3d 484, 488 (5th Cir. 2013). "Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *see also* Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Amerisure Ins. Co. v. Navigators Ins. Co.*, 611 F.3d 299, 304 (5th Cir. 2010) (quoting *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 417 (5th Cir. 2008)). "Evidence is construed 'in the light most favorable to the non-moving party, and we draw all reasonable inferences in that party's favor.'" *R & L Inv. Prop., L.L.C. v. Hamm*, 715 F.3d 145, 149 (5th Cir. 2013) (quoting *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 221 (5th Cir. 2011)).

## III.

We must first decide whether federal or state law applies to Fisk's claim for fraudulent inducement into the settlement agreement. Fisk argues that

No. 17-30091

federal law applies because the release "arose out of a federal law dispute (the Miller Act)." Fisk contends that the district court failed to apply the correct legal standard for justifiable reliance by imposing an active duty of investigation on the party alleging fraud. DQSI argues that summary judgment was appropriate here under both federal law and Louisiana law.

Federal law applies. "Questions regarding the enforceability or validity of [settlement] agreements are determined by federal law—at least where the substantive rights and liabilities of the parties derive from federal law." *Mid-S. Towing Co. v. Har-Win, Inc.*, 733 F.2d 386, 389 (5th Cir. 1984) (applying federal law to decide the validity of a settlement agreement because the claims in the case were premised on general maritime law). "The Miller Act provides a federal cause of action, and the scope of the remedy as well as the substance of the rights created thereby is a matter of federal not state law." *F.D. Rich Co. v. United States ex rel. Indus. Lumber Co.*, 417 U.S. 116, 127 (1974), *superseded by statute on other grounds*; *see also Liberty Mut. Ins. Co. v. United States ex rel. Lamesa Nat'l Bank* (*In re Schooler*), 725 F.3d 498, 508 (5th Cir. 2013) (stating that "with the bond required under the Miller Act, the rights and obligations . . . do not originate in state statutes, but rather derive from federal law and the bond issued in compliance therewith").

The Miller Act serves "to protect persons supplying labor and material for the construction of federal public buildings in lieu of the protection they might receive under state statutes with respect to the construction of nonfederal buildings." *Arena v. Graybar Elec. Co.*, 669 F.3d 214, 220 (5th Cir. 2012) (quoting *United States ex rel. Water Works Supply Corp. v. George Hyman Constr. Co.*, 131 F.3d 28, 31 (1st Cir. 1997)); *see also United States ex rel. Sherman v. Carter*, 353 U.S. 210, 216 (1957), *superseded by statute on other grounds*. "The Act gives suppliers and subcontractors the right to sue a prime

8

contractor in U.S. district court for the amount owed to them." *Arena*, 669 F.3d at 220.  Thus, the district court was correct that "[b]ecause the claims in this case are premised on the Miller Act, federal law governs the validity of the Agreements and thus any fraud claim that might invalidate them."

*Young v. BP Exploration & Production, Inc.* (*In re Deepwater Horizon*), 786 F.3d 344 (5th Cir. 2015) (*Deepwater Horizon I*), is instructive here.  In that case, the district court enforced a settlement agreement against BP.  786 F.3d at 348.  BP argued, among other things, that the appellee fraudulently induced it into entering the settlement agreement.  *Id.*  Rather than holding that BP's fraudulent-inducement claim was governed by state law (despite BP's argument that Louisiana law, not federal law, applied), we held that because the appellee "alleged causes of action under general maritime law and the Jones Act against BP, federal contract law governs the validity and enforceability of [the appellee's] putative settlement agreement with BP."  *Id.* at 354; *see id.* at 354 n.14.

Here, the rights and liabilities of the parties allowing Fisk to sue DQSI and Western for delay damages incurred in a federal construction project derive from the Miller Act, and thus federal law applies.  *See In re Schooler*, 725 F.3d at 508; *Deepwater Horizon I*, 786 F.3d at 354.  "[F]ederal contract law is largely indistinguishable from general contract principles under state common law."  *Deepwater Horizon I*, 786 F.3d at 354.  "A court may set aside a settlement agreement induced by fraud," and "[t]he essential elements of fraudulent inducement into a settlement are no different from any action on fraud."  *Id.* at 362 (quoting 15B Am. Jur. 2d Compromise & Settlement § 32 (2d ed. 2014)).  The elements of fraudulent inducement are that:

> (1) a material representation was made; (2) the representation was
> false; (3) when the representation was made, the speaker knew it
> was false or made it recklessly without any knowledge of the truth

and as a positive assertion; (4) the representation was made with the intention that it be acted upon by the other party; (5) *the party acted in reliance on . . . the representation*; and (6) the party suffered injury.

*Id.* at 363 (emphasis added) (quoting *O'Hare v. Graham*, 455 F. App'x 377, 379–80 (5th Cir. 2011)). "For common law fraud, we look to justifiable reliance as the common law standard for reliance." *Lake Eugenie Land & Dev., Inc. v. BP Expl. & Prod., Inc.* (*In re Deepwater Horizon*), 643 F. App'x 377, 382 (5th Cir. 2016) (*Deepwater Horizon II*) (unpublished)[7] (citing *Field v. Mans*, 516 U.S. 59, 71–75 (1995)).

Having determined that federal law applies, we must next decide whether the party alleging fraud must engage in active investigation to satisfy the standard of justifiable reliance. Although the district court initially determined that federal law applied, it later incorporated Louisiana law on justifiable reliance into the federal standard. DQSI contends that there is no meaningful difference between federal law and Louisiana law on the requirements of justifiable reliance. Moreover, DQSI insists that there is no genuine issue of material fact on the element of justifiable reliance because Fisk is a sophisticated party that did not actively investigate whether DQSI was engaged in fraud.

DQSI fails to apprehend the requirements of justifiable reliance under federal law. Supreme Court precedent—on which both Fisk and DQSI rely—shows that federal contract law relating to fraudulent inducement does not require active investigation to demonstrate justifiable reliance. In *Field v. Mans*, the Supreme Court defined justifiable reliance by looking to the

---

[7] Pursuant to Fifth Circuit Rule 47.5.4, unpublished opinions issued on or after January 1, 1996, generally are not precedent, although they may be cited as persuasive authority pursuant to Fed. R. App. P. 32.1(a).

No. 17-30091

Restatement (Second) of Torts as "the most widely accepted distillation of the common law of torts."  516 U.S. at 70; *see also* 516 U.S. at 61 (holding that § 523(a)(2)(A) of the Bankruptcy Code requires not a standard of reasonable reliance but the "less demanding one of justifiable reliance").  The Court stated that "[t]he Restatement expounds upon justifiable reliance by explaining that a person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'"  *Id.* at 70 (quoting Restatement (Second) of Torts § 540 (1976)).

The Court found instructive the Restatement's illustration of a seller who claims his land is free of encumbrances: "according to the Restatement, a buyer's reliance on this factual representation is justifiable, even if he could have 'walked across the street to the office of the register of deeds in the courthouse' and easily have learned of an unsatisfied mortgage."  *Id.* (quoting Restatement (Second) of Torts § 540 illus. 1).  Under a standard of justifiable reliance, "the plaintiff is entitled to rely upon representations of fact of such a character as to require some kind of investigation or examination on his part to discover their falsity, and a defendant who has been guilty of conscious misrepresentation can not offer as a defense the plaintiff's failure to make the investigation or examination to verify the same."  *Id.* at 72 (quoting 1 Fowler V. Harper & Fleming James, Jr., The Law of Torts § 7.12, pp. 581–83 (1956)).[8]

---

[8] DQSI leans heavily on the statement in *Field* that "it is only where, under the circumstances, the facts should be apparent to one of [the victim's] knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that [a victim of alleged misrepresentation] is required to make an investigation of his own."  516 U.S. at 71–72 (quoting William L. Prosser, Law of Torts § 108, p. 718 (4th ed. 1971)).  On this record, however, there is a genuine issue of material fact as to whether it should have been apparent to Fisk "from a cursory glance" that it was required to investigate further and whether Fisk "discovered something which should [have] serve[d] as a warning that [it was] being deceived."  *See id.*  Importantly, the settlement negotiations occurred after Fisk's FOIA request, and Fisk's supervisor of

11

No. 17-30091

We have held the same. In *Deepwater Horizon II*, we applied federal law in a maritime case involving an oil spill settlement program. 643 F. App'x at 381. We held that the administrators of the oil spill settlement program justifiably relied on misrepresentations even though they "failed to investigate the claims more thoroughly." *Id.* This was because "the requirement of justifiable reliance does not impose a duty of active investigation on a plaintiff, and does not entitle a defendant to exploit a plaintiff's foolishness with impunity." *Id.* at 382–83 (quoting Restatement (Third) of Torts: Liab. for Econ. Harm § 11 cmt. d (2014)).[9]

Here, there is a genuine issue of material fact on the element of justifiable reliance.[10] DQSI emphasizes that Clyne, Fisk's supervisor of operations, obtained through the FOIA request copies of all the contract

operations stated that DQSI's representations during negotiations "laid to rest" his previous concerns.

[9] DQSI fails to address *Deepwater Horizon II* in its response brief, although Fisk relies on this case extensively in its opening brief.

[10] Based on *Hobbs v. Alcoa, Inc.*, 501 F.3d 395 (5th Cir. 2007), DQSI contends that the integration or merger clause in the settlement agreement barred Fisk's fraudulent-inducement claim as a matter of law. Assuming *arguendo* that this argument was not forfeited, the integration- or merger-clause cases DQSI cited at oral argument do not undermine our holding that there is a genuine issue of material fact on the element of justifiable reliance. *Hobbs*, like *Armstrong v. American Home Shield Corp.*, 333 F.3d 566 (5th Cir. 2003), and *U.S. Quest Ltd. v. Kimmons*, 228 F.3d 399 (5th Cir. 2000), is a diversity case that applies Texas law on the effect of integration or merger clauses on potential fraud claims. *See Hobbs*, 501 F.3d at 397–98. Even under Texas contract principles, "a merger clause can be avoided based on fraud in the inducement and . . . the parol evidence rule does not bar proof of such fraud." *Armstrong*, 333 F.3d at 571 (quoting *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 179 (Tex. 1997)). Where an agreement does not reflect the "requisite clear and unequivocal expression of intent necessary to disclaim reliance on the specific representations," a fraudulent-inducement claim may proceed. *See Dunbar Med. Sys. Inc. v. Gammex Inc.*, 216 F.3d 441, 451 (5th Cir. 2000) (quoting *Schlumberger*, 959 S.W.2d at 179) (determining that a merger clause was insufficient to bar a fraudulent-inducement claim). Simply put, here Fisk has not shown the "clear and unequivocal expression of intent" necessary to disclaim reliance on DQSI's alleged misrepresentations during mediation and settlement negotiations.

12

modifications months before mediation.  DQSI contends that Fisk could have contacted the Corps directly to determine whether the unsigned contract modifications it had obtained represented finalized, binding documents.  As a subcontractor, however, Fisk had no direct relationship with the Corps. Moreover, the affidavit of Glenn A. Price supports Fisk's contention that it reasonably believed at settlement that negotiations with the Corps were ongoing and thus that the 464-day delay damages claim was still viable.[11] Price, an expert with significant experience in federal construction projects, states that "the modifications received by Fisk in response to its FOIA Request were not fully executed" because "DQSI was required to sign the modifications" but had not done so.  Price also notes that DQSI could have protected its subcontractors by striking the "Closing Statement" of the contract modifications that waived any future claim for delay damages.

In addition, the summary-judgment record contains affidavits stating that DQSI made representations during mediation and settlement negotiations that the Request for Equitable Adjustment for the 464-day delay damages claim was still viable.  Clyne, Fisk's supervisor of operations, states in an affidavit that "[b]ased on the representations made at mediation by DQSI, my concerns about the [Request for Equitable Adjustment] expressed in

---

[11] DQSI contends that Price's affidavit "consists of little more than conclusory statements" and is therefore insufficient as summary-judgment evidence.  The authorities DQSI cites to support this assertion show that "unsupported affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Orthopedic & Sports Injury Clinic v. Wang Labs., Inc.*, 922 F.2d 220, 223–25 (5th Cir. 1991) (quoting *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985)) (determining that an expert's affidavit in a case involving a gross-negligence claim was "wholly or almost wholly conclusory" where the expert's affidavit stated that defendant was "grossly negligent").  Price's affidavit, however, offers more than such ultimate or conclusory facts and conclusions of law.  As demonstrated above, his affidavit contains specific statements that are intermediary points along the road to evaluating justifiable reliance.

my December 10, 2013 letter were laid to rest." According to Clyne, "[w]ithout the representations made by Mr. Lee and Mr. McCumsey and the understanding that Fisk had a viable option to present its claims to the Corps, I would not have accepted the settlement agreement." Thomas, Fisk's in-house general counsel who executed the settlement agreement on Fisk's behalf, states in his affidavit that during negotiations he "was specifically told by representatives of DQSI that DQSI had not received payment for the work done by Fisk or for its delay damages and therefore Fisk could present a request for adjustment (REA) to obtain payment." According to Thomas, "Fisk relied on this fundamental representation by DQSI in accepting the settlement agreement . . . ."[12]

In the settlement agreement, DQSI agreed "to submit a Request for Equitable Adjustment ('REA') presented by Fisk to [the Corps]." DQSI insists that there is a significant distinction between "a" Request for Equitable Adjustment and "the" Request for Equitable Adjustment. This argument is meritless.[13] If submitting any Request for Equitable Adjustment for delay damages stemming from the 464-day delay was impossible—and if DQSI but not Fisk knew this at the time of settlement negotiations—then it is a small wonder that the district court found "very convincing evidence of fraud by [DQSI]." On this record, applying the correct legal standard, there is a genuine issue of material fact regarding whether Fisk justifiably relied on DQSI's representations about Fisk's Request for Equitable Adjustment at settlement.

---

[12] Fisk contends that "[t]he district court erred by evaluating the credibility of the witnesses and the weight of the evidence." We need not reach this issue to determine that granting summary judgment was unwarranted here.

[13] Indeed, in the memorandum of agreement, which the settlement agreement was "meant to formalize," DQSI agreed "to submit to [the Corps] *the* Request for Equitable Adjustment presented by Fisk . . . ." (emphasis added).

No. 17-30091

IV.

Accordingly, we REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.